**JEFFERSON COUNTY DRAINAGE DISTRICT NO. 6, Appellant,**

v.

**LOWER NECHES VALLEY AUTHORITY, Appellee.**

No. 09–92–233 CV.

Court of Appeals of Texas, Beaumont.

May 19, 1994.

Rehearing Overruled June 23, 1994.

Karl C. Hoppess, Richard P. Hogan, Jr., Holman Hogan, Houston, for appellant.

Hubert Oxford, III, Benckenstein, Oxford & Johnson, Beaumont, for appellee.

Before BROOKSHIRE, BURGESS and WHITHAM [1], JJ.

### OPINION

BROOKSHIRE, Justice.

Appeal from a bench trial. The bench denied Jefferson County Drainage District No. 6's petition for a writ of mandamus. DD6 had filed a cross-claim for a writ of mandamus against LNVA. Procedurally, the appeal is from an "instructed verdict" favor-

---

1. Justice, Retired, Court of Appeals, Dallas, sitting by assignment pursuant to Tex.Gov't Code Ann § 74.003(b) (Vernon 1988).

ing Lower Neches Valley Authority and from the judgment below.

In the appellant's reply brief, Jefferson County Drainage District No. 6 (DD6) states:

> On appellate review, mandamus will issue to correct violation of a duty imposed by law when there is no other adequate remedy at law or to correct a clear abuse of discretion. *Strake v. Court of Appeals for the First Supreme Judicial District of Texas,* 704 S.W.2d 746, 747 (Tex.1986).

That is the controlling, paramount issue in this appeal. DD6 also maintains:

> The court of appeals is charged with making *an independent inquiry* whether the underlying act, or refusal to act, of the public officer, (and for which act or refusal to act mandamus is sought), is contrary to a clearly established legal duty or rises to the level of a clear abuse of discretion. *Anderson,* 806 S.W.2d at 793; *Strake,* 704 S.W.2d at 747 (emphasis theirs).

We have tried to make a full, independent inquiry.

■■■ In *Strake,*[2] Justice Wallace wrote: "Mandamus issues *only* to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy at law." (emphasis added). The inquiry to be made by the intermediate court is whether the act, or refusal to act of a public officer *is contrary to a clearly established legal duty.* In *Anderson v. City of Seven Points,* 806 S.W.2d 791 (Tex.1991) Justice Hightower, speaking for a unanimous court, wrote:

> A writ of mandamus will issue to compel a public official to perform a ministerial act. [Citations omitted] An act is ministerial when the law *clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion.* [Citations omitted] Furthermore, a writ of mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion. (emphasis added)

For an act to be considered as ministerial—for mandamus purposes—the law involved must clearly spell out the *duty to be performed with sufficient certainty that nothing is left to the exercise of discretion.* When considering a question of "clear abuse of discretion", that clear abuse of discretion occurs when a public officer or a public body reaches a decision that is so arbitrary and so unreasonable as to amount to a clear and prejudicial error of law. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex. 1985).

■■■ Hence, a relator who attacks a ruling of a trial court as an abuse of discretion labors under a very heavy burden. The relator must establish, under the circumstances and factual background of the litigation, that the facts and the law would have permitted the trial court to make but one decision.

### The Start of Litigation

This litigation commenced when one Mr. J.B. Clark, being a private landowner and plaintiff, sued the other parties. Clark's lawsuit was settled and his claim was severed, showing that, in practicality, Clark had an adequate remedy at law for money damages. The mandamus action was tried to the bench. After very considerable testimony was heard and after about seven or eight days of trial, the trial judge entered his order granting what was described as an "instructed verdict" against DD6. The "instructed verdict", of course, was in favor of LNVA. We affirm.

### A Brief Narration of Background History

In 1920, the Commissioner's Court of Jefferson County was petitioned to form the drainage district that was known locally as DD6. The petition was granted. Beginning at about the year 1943, DD6 and LNVA corroborated in certain projects by agreement. Between 1958 and 1981, by agreement and mutual consent, there had been a cost-sharing basis on several improvements involving several of LNVA's canals—but al-

---

2. *Strake v. Court of Appeals,* 704 S.W.2d 746 (Tex.1986)

ways on a case-by-case basis. In about 1980, this consensual cooperation largely ceased. After about 1981 to about May of 1985, each project initiated by DD6 was brought before the LNVA on a project-by-project basis— usually a single project or case at a time. Appellant's brief concedes that these projects were done by voluntary agreement of both parties.

Appellant points out that in about 1979 to and through 1980, Beaumont and Jefferson County experienced some unusually heavy rainfalls. Some of the heaviest rain fell in the upper part of Jefferson County. There existed a public consensus for improvements to drainage and improvements to the management of unusually heavy rain water. Certain public hearings were held. At this point, DD6 became involved as a local sponsor of projects to improve the flooding and drainage problems. After consideration by DD6, DD6 selected a standard of a 25 year flood based on the proposition that its main outflow would then be discharged through Taylor's Bayou. This standard would take care of a 25 year frequency storm without creating damage down stream.

The study and the standards used involved three large areas being the Pine Island Bayou Watershed, the Taylor's Bayou Watershed, and the Hillebrandt Bayou Watershed. DD6 had added new watersheds. In summary, DD6 sent a letter to the directors of the LNVA for a commitment of $200,000 a year for five years or six years in order to perform fifteen or sixteen improvements of what was said to be storm and flood drains in and around the canals of LNVA.

The appellant maintains that there was evidence at trial that some of the canals were located on natural drainage areas and these canals impeded the *natural flow of the drainage* and altered the speed and discharge of certain surface waters within the area of DD6. LNVA responded and agreed to partial participation in two projects only.

### DD6's Positions and Contentions

Moreover, as we read the statement of facts one of the attorneys for the appellant conceded that because of certain conditions and circumstances that the court could conceivably issue mandamus against the LNVA to "get its canal out of there" or the court *could pick and choose among the fifteen or sixteen requests.* This position of DD6 tends to support the basic concept that mandamus would not lie, because if the court could pick and choose which project should be mandated then LNVA had discretion as well. DD6's counsel's statement is substantially this:

*I think there's no question that in every instance there has been a case-by-case basis up until May of 1985;* and the—and the situation, the frustration that DD6 felt is the same frustration that I feel in the fact that the circumstances are *this Court could order all of them, part of them, none of them in—in that regard.*

And there are three main issues: Duty and obligation—legal duty and obligation; arbitrary and capricious; and estoppel.... (emphasis added)

[This opinion will address each of these "main issues".]

THE COURT: Well, Mr. Hoppess, let me see if I understand the last thing you said. You're saying that as to each individual crossing—

MR. HOPPESS: Yes.

THE COURT: —that there is a question of whether or not there is—the enabling statute created a duty for this board to do not an individual crossing but whether they have a duty to do crossings in general—

MR. HOPPESS: Correct.

THE COURT: You're saying that I would find that the board was arbitrary and capricious as to individual decisions as to individual crossings?

MR. HOPPESS: Correct.

That concession tends, we perceive, to concede discretion, prudence, and good judgment reposed in LNVA and its board of directors. If the court could pick and choose, then why couldn't LNVA. The bench observed:

And I think the question that you are presenting here is whether or not, in their discretion in carrying out their duties as board members, whether they acted in an arbitrary and capricious manner on this occasion when they were given this particular proposal; ...

And it appears to me that what *you are asking me to do does border on going in to fine-tuning of a board.* (emphasis added)

### LNVA's Factual Contentions

The factual contentions recited by LNVA offers a different context and certainly have a different meaning from the factual position recited by DD6.

LNVA maintains that it is a sub-division and an independent entity of the State of Texas created under the Conservation Amendment of the TEX.CONST. art. XVI, § 59 (Vernon 1993). LNVA operates under a certain enabling legislative enactment being TEX.REV.CIV.STAT.ANN. art. 8280–103 (Vernon 1954), as amended, and operates also under TEX.WATER CODE ANN. § 50.001 et seq. (Vernon 1988 and Vernon Supp.1994). LNVA encompasses Tyler, Hardin, and Jefferson counties and certain portions of other counties and its revenues are derived from the sale of water. The Valley Authority is not authorized to either levy or collect taxes. TEX.REV.CIV.STAT.ANN. art. 8280–103, § 1 (Vernon 1954), as amended. Section 59(b) of article XVI provides that such number of conservation and reclamation districts shall be governmental agencies with the powers of government and the authority to exercise such rights and privileges and functions concerning the subject matter of this amendment *as may be conferred by law*—obviously legislative statutes. The Texas Water Code § 51.121(b) provides that such a district (as LNVA) organized under article XVI, § 59 of the Texas Constitution *may* provide for certain projects—clearly used here in a permissive sense. Section 51.122 concerning the powers of a district does not mandate that the district exercise and complete all of such powers granted to the district; § 51.122 provided no detailed methods or means.

### The Background of LNVA

Prior to the existence of LNVA, the Beaumont Irrigation Company and the Neches Canal Company existed and built the canals in question in about the years 1899 and 1902. LNVA was a successor to those interests and titles. The record reflects that all of LNVA canals except one were in place by the year 1913. The record is devoid of evidence to show that at that time there were not adequate crossings of natural drainage in place under or over the LNVA canals when they were constructed.

### DD6's Creation

DD6 was created in 1920 by the Jefferson County Commissioner's Court under article XVI, § 59 of the Texas Constitution and enlarged by Act of June 16, 1961, 57th Leg. R.S., ch. 349, 1961. DD6 is governed and regulated by TEX.WATER CODE ANN. § 56.001 et seq. (Vernon 1988 and Vernon Supp.1994). These entities are correctly known as drainage districts. *See* § 56.001(a). LNVA concedes that it participated and contributed to some of DD6's requests to drainage improvement projects from about 1955 to 1981. The improvement projects were in the northern and western part of Jefferson County. They were presented on a project-by-project basis and the matters presented were *in the forms of requests to LNVA for its participation.*

### DD6's Powers, Duties, and Requests— LNVA's Response

■ TEX.WATER CODE ANN. § 56.117 (as applicable to DD6) provides improvements included in the *engineers' reports and adopted by the Commissioner's Court shall be constructed.* Such words as "shall be constructed" shows a mandatory affirmative duty to go forward with the construction to completion. Under § 56.119 any such drainage district has the full power of eminent domain. In May of 1985, DD6 desired for LNVA to participate in fifteen or sixteen projects on a 50–50 cost basis, extending over a period of five or six years. On May 16, 1985, DD6 formally sent LNVA a letter re-

questing such participation in the aforementioned projects.

Importantly, the request to LNVA to commit 50 percent of the costs of the construction of the fifteen or sixteen proposed drainage projects over a five or six year period, was an uncertain request, uncertain as to time and uncertain as to the amounts of financial obligations.

LNVA appointed a finance committee to investigate this request. And LNVA did much more. LNVA had its general counsel to prepare a legal opinion on whether LNVA had an affirmative duty to participate in the requests from DD6. The finance committee recommended that LNVA participate in reconstructing only two of the crossings requested by DD6 but not to participate in the remaining thirteen crossings. LNVA's board of directors did take the request up—project by project. LNVA reviewed and discussed the DD6 proposal a number of times. The board discussed its financial committee's report as well as its general counsel's opinion and using its discretion, prudence, and judgment, LNVA acted on the ample record before it. We deem that the record reflects that there were rational and reasonable bases for LNVA to make the decisions it made. Reasonable and rational factors existed to justify LNVA's reluctance to enter into uncertain, unlimited financial obligations for future projects.

### LNVA's Enabling Statute

The empowering statute, TEX.REV.CIV. STAT.ANN. art. 8280–103 creates the Lower Neches Valley Authority and creates the same as a conservation and reclamation district, being a governmental agency, body politic, and corporate entity vested with authority as such under the constitution and laws of the State. LNVA shall have and be recognized to exercise all the powers of such governmental agencies as expressly authorized in the provision of the TEX. CONST. art. XVI, § 59. That section 59 provides that the *legislature shall pass all such laws as may be appropriate.*

■ Simply put, art. 8280–103 does not mandatorily require the LNVA to accede to the demands such as were made by DD6. The language used more than once is that such district (LNVA) shall have and be recognized to exercise such authority and power to control and regulate waters of the Neches River and its tributaries. There is nothing in art. 8280–103 that is comparable to the statutes which require DD6 to build or construct improvements when the commissioners order the same upon the approval of an engineer's report as noted above.

A careful reading of article 8280–103 clearly demonstrates that a not dissimilar situation might be where a school board has the power and is recognized as having the purpose of educating the scholastics within its district. However, another school district cannot mandate the first school district as to where to place its high school or as to the curriculum to be offered or as to how it shall run its buses to transport the children to school. The phrase "be recognized to exercise such powers" means simply that it is acknowledged that LNVA has the right and the ability to exercise powers but the recognition of these powers is not equivalent to a command to perform and make the proposed projects into completed constructions—nor does Article 8280–103, nor the quoted phrase impose a duty on LNVA to subjugate itself to DD6's fifteen projects, which were planned by DD6. Nor does LNVA, under art. 8280–103, have to submit to paying 50 percent of the cost as determined by DD6.

Very simply put the phrase "shall have the power" falls short of a command "you must construct an improvement or project to completion". As used in the statutes applicable to this case the word "shall" is not equivalent but falls short of the phrase "you must do it" and "you must do it in a specific manner". The enabling legislation art. 8280–103 entitled "Lower Neches Valley Authority" is meant to acknowledge the powers that are authorized by the TEX.CONST. art. XVI, § 59. The LNVA by the same statute has the rights and powers of an independent governmental agency. Section 3 of article 8280–103

specifically provides *that the management and control of all of the affairs of such district shall* be vested in its own Board of Directors.

The LNVA is recognized to possess powers for the conservation and *beneficial utilization* of "said waters". *Beneficial utilization involves discretion.* The statute provides that the LNVA can purchase or construct all works necessary or *convenient for the exercise of its powers.* Again, concepts and decisions of what is necessary and especially what is convenient certainly involve discretion, judgment, prudence, and responsible business-like management.

In one provision, it is the intent that the fees and charges made by such LNVA district shall not be in excess of what *may be reasonably necessary to fulfill the district's obligations.* The admonition of reasonable necessity certainly *involves discretion, prudence and reason.* The term "necessary or convenient to carry out any of the powers granted" necessarily involves reason, discretion, prudence, and the proper exercise of good business judgment.

In fact, to insure prudence, reasonable action, and the exercise of good discretion the *powers and duties of the district are subject to the continuing rights of the State which shall be exercised through the State Board of Water Engineers and in the appropriate instances by the State Reclamation Engineers.* Again, in section 15 it is provided that the district shall have and *may* exercise its function and powers. This important section 15 uses the permissive and paramount phrase "may exercise". That concept irrefutably involves discretion. The enabling act simply does not affirmatively mandate and dictate to the LNVA that it must accede to the plans of DD6 touching upon fifteen or sixteen crossings. The enabling act is not a diktat to LNVA to forcibly and mandatorily appropriate $200,000 or more for each of the future four or five years. We perceive nothing in the amendments to the enabling act or in the TEX.WATER CODE ANN. § 50.001 et seq. that vitiates the position taken herein by LNVA

or eviscerates the sound judgmental discretion of its Board of Directors.

On the other hand, DD6 is governed by the TEX.WATER CODE ANN. § 56.001 et seq. (Vernon 1988 and Vernon Supp.1994) which sections apply to drainage districts and to the enabling legislation of drainage districts. DD6 has as its source of revenue the power of taxation imposed upon properties within its boundaries.

### The Record and the Procedural Aspects at Trial

The record reflects that DD6 rested its case unequivocally on June 11, 1992. The resting of the case took place after eight days of trial testimony during which a number of witnesses were presented in the bench trial. DD6's experienced, able counsel took the position that the statutory grounds for mandamus relief existed under LNVA's enabling act and also TEX.WATER CODE ANN. § 11.086 (Vernon 1988). *DD6 agreed that the existence of statutory duties were questions of law to be determined by the bench.*

Furthermore, the record clearly reflects that a committee of LNVA met a number of times with DD6 to try to reach or work out a compromise with DD6. No compromise was reached. Nevertheless, the fact that a committee of the board of LNVA met with DD6 on numerous occasions in an attempt to negotiate a compromise is an acknowledgement on the part of DD6 that LNVA had a right to exercise its discretion in regard to the fifteen new projects. These meetings were evidence of good faith. These meetings disprove arbitrary or capricious action by LNVA.

In fact, the record also reflects that the LNVA sought additional legal counsel after the first legal opinion in an attempt to determine whether it acted rightfully or wrongfully in 1985. Without objection a witness testified that the board and the members of the board used their discretion not to change their prior decision. New members of the LNVA board also reconsidered the 1985 re-

quests of DD6. This testimony along with other strands of testimony negates that LNVA's actions were capricious, arbitrary, and unreasonable. We decide that the 1985 decisions and those later decisions are reasonable.

A director swore that if he neglected and dismissed his responsibility for looking at every expenditure and then to give money to another entity for an indefinite time, and make a commitment to do whatever the other entity proposed, that action would amount to negligence in that director's functions.

### The Estoppel Question

■■■ Although we hold with sagacity that estoppel cannot be used as a affirmative recovery, a case-by-case history is different from a request of fifteen cases involving $1,000,000 or more over a five year or longer period. There is no estoppel doctrine applicable under this record. *Then, counsel reiterated that his position was that there were three main issues, duty and obligation—that is legal duty and obligation; the issue of arbitrariness and capriciousness and estoppel. In brief, we have found no affirmative legal duty and obligation. In this record, we have found no arbitrary and or capricious action. Estoppel is simply not available to DD6.*

But DD6's counsel insisted that his position was that the enabling statute created a general duty on the part of LNVA to participate and proceed with the fifteen projects. As we read and interpret the enabling statute, no such general duty exists. We hold the bare grant of a power fails to constitute an affirmative, active duty. DD6's counsel continued to explain and expound his basic precepts:

> But the finance committee said on B–1, "Because it affects our water quality, we will contribute 300,000. We'll contribute 50 percent of this requested situation."

> But what I'm saying to you is is that it could be—in other words, that portion of their decision, the overall decision is arbitrary and capricious according to me, according to our argument; but it is also arbitrary and capricious to recognize that this particular crossing is totally blocked by the LNVA and that the only access of runoff—no matter what it's created from, no matter what it existed in 1899 or whatever it is—has been blocked by this ditch.

It is notable that LNVA gave *reasons* to participate in crossing B–1 because it affected and improved the quality of their water.

### The Status of a Downstream, Lower Landowner

DD6 wanted a writ of mandamus to LNVA to *remove the canals or reconstruct each one of these crossings and reconstruct them as the drainage district proposes.* LNVA was authorized to distribute water through its canals and to sell water—not having the authority to tax. A basic position taken by LNVA was that the applicable law was clear that this LNVA authority was a downstream landowner and that its obligation was to take and pass water as it came to it *untouched by human hands, not after the channelization by the drainage district or the urbanization of the area.* LNVA empowerments did not mandate the 5 year storm or the later 25 year storm standard as was adopted by DD6. The LNVA maintained that it was obligated only to receive and be subject to the normal, natural drainage from the upper land owners which had not been altered by man or by DD6 and that indeed the hand of man and the actions of DD6 had created an accumulation and acceleration of water. In other words, the amount of water and the rapidity of the flow of water had increased over the years because of the hand of man and was different from when the original canals were put in place.

### The § 11.086 Water Code Issue

We note that the court stated that the evidence and exhibits proffered were on the estoppel issue. It is significant also that since the LNVA canals were put in place, that much later DD6 in 1961 was enlarged to

take in at least one additional watershed. Some of the crossings involved man-made drainage ways or channels.

 Then DD6's counsel conceded that § 11.086 cannot be the basis for a writ of mandamus but that § 11.086 provides only for a remedy for private landowners to obtain damages for flooding. The record reflects that the court was not going to put its discretion in place of the board's discretion. DD6's counsel conceded that the court had made a determination in a bench trial at the conclusion of DD6's evidence that it had not shown that LNVA had not used reasonable discretion in making a determination not to participate in the crossings in question. The court, at this hearing, summarized his prior tentative view and his present position:

> [T]he reason I signed this was I thought it was an accurate description of what I was saying from the bench, which was that there was a statutory duty created, in my opinion, and that that statutory duty—the remedy for it is a private remedy and that the discretionary action of carrying out that duty was not something that was subject to mandamus. And I think that each of those findings goes to—each of those legal conclusions goes to the basis of my decision in the case and it seemed to me to be appropriate to be in conclusions of law.

Granting a power is not a command to perform a duty by affirmative action unless the wording so mandates in forceful and stringent specifications; nor does the enabling statute granting a power mandate the LNVA to go forward with a positive, active, affirmative duty of construction and cost-sharing—planned by DD6. The trial judge's position was that even in the exercise of the power that the board would have ample discretion and had not acted arbitrarily or capriciously or whimsically and therefore writ of mandamus would not lie. We must agree.

 The real thrust of § 11.086 (providing that no person may divert or impound the natural flow of surface waters) speaks only to natural flow untouched by the hands of man and surface waters. We find in the record that none of these waters in question were untouched by the hands of man. We conclude that all of the crossings involved (with the one exception designated I–1), and the ditches and drains had been channelized at a later time, subsequent to the year 1920.

 Surface waters do not remain surface waters when these waters enter into a channel that has been touched or modified by the hands of man. Surface waters are those which are diffused underground from the falling rain or melting snow and continue to be such until those waters reach some channel. *Mitchell v. Blomdahl,* 730 S.W.2d 791 (Tex.App.—Austin 1987, writ ref'd n.r.e.). *Mitchell* has determined that once the surface water enters a channel or some channelization, then the same ceases to be surface water. The lower landowner's *duty is only to receive the natural flow of this surface water. Bunch v. Thomas,* 121 Tex. 225, 49 S.W.2d 421 (1932). *Bunch v. Thomas* holds that "[s]ince the subservient estate ... is charged only with receiving the flow of surface waters from the dominant heritage [apparently of the upstream land owners] while these waters reach the borders ... in their natural state, untouched by the hands of man, it necessarily follows that the statute [that statute being the predecessor of 11.086] involved affords no protection" to the upstream land owners. *See Miller v. Letzerich,* 121 Tex. 248, 49 S.W.2d 404 (Tex.1932); *Cone v. City of Lubbock,* 431 S.W.2d 639 (Tex.Civ. App.—Amarillo 1968, writ ref'd n.r.e.).

But LNVA insists that this is not a natural drainage situation. All of this drainage has been touched by the hand of man. We concur. LNVA and its predecessors filed for approval of the canals with the board of water engineers. The trial court had those approvals before it in exhibits. The maps and exhibits demonstrate that the crossings of the truly natural drainages had been approved by the proper authority.

We have tried to discuss above the matters presented in the briefs before the Points of Error were set forth. The formal points are now addressed.

### Appellant's First Point of Error

■ The appellant's formal first point of error is that the trial court erred in granting an instructed verdict for LNVA because there is allegedly *some evidence* to support mandamus relief. We disagree with this standard of "some evidence". This appeal is from the denial of a writ of mandamus. Although the record reflects that there was some cost sharing between LNVA and DD6 on previous requests, the same was done on a case-by-case basis. DD6's reliance upon the so-called "some evidence" standard to dictate mandamus relief is misplaced. The record revealed that only two crossings (of the present fifteen or sixteen requested) had been worked on previously on a cost-sharing basis. But the percentages have varied widely.

Counsel for DD6 on this point of estoppel conceded that he would certainly stipulate that DD6 had done channelization. Counsel for DD6 also conceded that upstream of all the crossings (except four) there had been channelization by DD6. There had been ditch work, brush clearing, dragline work, and other work. Hence, indisputably, the hand of man had affected these drains and drainages. DD6 stated in the record that the speed and the accumulation of the water probably took place because there had been work done by DD6 on these drainage areas. Work had been done that actually cut into and changed the natural drainage. The stipulation or agreement between counsel, as understood by the trial court, was that in the upstream areas there had been channelization. The drainage had been substantially affected by a ditch or ditches. From viewing aerial photographs these ditches were shown to have been cut by man because these ditches were straight; they were not natural. Therefore, these types of ditches could not be deemed to be natural drainages. This part of the record was proffered by DD6. The substantial changes could not in law increase the burden on the lower lands. No duty, therefor, existed; no estoppel took place.

Under appellant's point of error I, DD6 argues that the instructed verdict was improper. The argument is that an instructed verdict is only proper when there is *no evidence* to support DD6's petition for mandamus. As authority, DD6 cites *Guthrie v. Ray*, 556 S.W.2d 589 (Tex.Civ.App.—Dallas 1977, no writ). We conclude that that rule applies to the ordinary civil case tried to the jury—but not to this mandamus. Again, DD6 insists that it is entitled to the most favorable construction that the evidence can afford and further, that DD6 is entitled to all the benefits of all reasonable inferences arising from such evidence, citing *Cameron County Good Govern. League v. Ramon*, 619 S.W.2d 224 (Tex.App.—Beaumont 1981, writ ref'd n.r.e.).

In *Guthrie*, the husband had brought an action to modify the divorce decree awarding custody of a child to the wife. This case was basically a matter arising out of a divorce. *Guthrie* was not a petition for writ of mandamus. *Guthrie* did not involve the question of a clear, legal, affirmation duty to be performed or a question of a board of directors acting in a capricious, whimsical, and arbitrary manner. The *Guthrie* case is clearly distinguishable from this appeal.

In *Cameron County Good Govern. League, supra*, the plaintiffs had complained to and charged the commissioners' court with failing to seek competitive bids for a county group insurance contract and that the commissioners had held meetings in violation of the Open Meetings Act and that the commissioners had purchased fire trucks without compliance with the competitive bidding requirements. As to the group insurance issue, the commissioners' court had awarded a group insurance contract covering the county's comprehensive employment and training administration (CETA) employees to a certain insurance company. CETA was a federally funded manpower training agency under the regulations of the Department of Labor of the United States government. These regulations required, inter alia, competitive bidding on such contracts. There was a clear, affirmative duty to at least submit such contracts to competitive bidding. By like reasoning, the court's purchase of certain caliche

road material was definitely in violation of county specifications because the caliche material was oversized. There the commissioners' court had disregarded and, indeed, violated its own county specifications.

Concerning the fire trucks, the Beaumont Court of Appeals stated that the relevant Texas Revised Civil Statutes, then article 2368a, section 2(b)(1), supplement 1980–1981, as amended, required the county to submit all contracts for more than $3,000 to competitive bids. A second statute was quoted that also required the commissioners' court to purchase such fire trucks by competitive bids. The complaint was that insufficient notice was given and that the notice was only for the purchase of one fire truck. And the Beaumont Court noted that the notice did, in fact, indicate that one fire truck would be purchased. This was not characterized as a strict mandamus proceeding but the opinion reveals that the commissioners' court had failed to perform affirmative, positive, active duties that were placed upon it by statutory law. The *Cameron County* case is not controlling. The *Cameron County* case was based on certain affirmative, positive, mandatory duties; it is not authority or controlling of this appeal.

The duties involved in the *Cameron County Good Govern.* case are simply distinguishable and vastly and meaningfully different from the powers granted to LNVA. For example, the statute requires that the LNVA shall keep a book of accounts and the books shall be audited by a certified public accountant. Thus, the statute spells out not only the power but the duty and how the duty is to be performed and who is to review the duty; namely, the certified public accountants. But the language concerning the keeping of the books and the audit thereof is meaningfully different from the powers of LNVA, which are relied upon by DD6.

As a corollary DD6 complains that the trial court actually made its decision before Jefferson County DD6 had closed its evidence. We disagree. During the trial, after approximately six days of testimony,

the trial court requested DD6 to expound on its grounds for a writ of mandamus and the court invited DD6 to indicate what additional evidence DD6 intended to present that was not merely cumulative of the testimony already received. The court did indicate that in *its tentative opinion,* arbitrary, capricious, whimsical, and illogical action by LNVA had not been shown. DD6 rested later, after completing its entire record. We hold that the evidence was mainly cumulative. No error is shown.

A director of LNVA testified. Without objection this director was asked if he felt that it was reasonable for him as a director to give to an entirely different and separate entity the authority to spend the money of LNVA. This director-witness testified that as a director he had the responsibility of looking at every expenditure. In fact, his opinion had strength and cogency to the effect that this director thought that if he did such an act, that is, just turn over money to another entity, that he should be removed from the board. And that was what the request asked and ultimately required. We perceive that such evidence had cogent and compelling relevancy and probative force because LNVA was defending against the accusation that it had acted arbitrarily, capriciously, and whimsically. Then a dialogue took place between counsel and the court and the counsel for DD6 stated:

> I am not asking this Court to enforce or to provide that letter of May the 16th, 1985; and by gosh, if nobody understands it, let it be known now I am not asking this Court to mandamus LNVA to respond or to provide in accordance to that letter.

Then the court asked what DD6 was asking the court to do. Response by counsel was:

> I am asking the LNVA to get their canals out *of the natural drainages;* and if they won't get them out of the natural drainages, then to provide adequate crossings under those or through those canals so as that the natural drainages that flow out of Jefferson County can go forward.

Notice that DD6's position only addressed "natural drainages". Then counsel for DD6 continued:

I do not want them contributing one half. I do not want them contributing 50/50 or 60/40 or 25/75. I want them [LNVA] to contribute everything at their own expense, whatever their engineers say, to create an adequate drainage at A–1, to create an adequate drainage under their canal at B–1 or anywhere else they want to—

. . . .

—to create an adequate drainage at C–1B.

Then the court addressed counsel:

There's no need to yell, and there's no need to get carried away.

If you have an argument to make, we can do it in a civilized way; and I find that inappropriate. All right.

I understand your position is that you are asking that they either remove these canals or that they provide the drainage which has been indicated in this letter, that the drainage—

[Counsel for DD6]: That's correct. And that's all—and I apologize to the Court. . . .

Then counsel for DD6 summed up by stating that DD6's position and the letter in question of May 16th "was the attempt by DD6 to continue the previous 40 years of participation, and all I've said is they had a right to rely on that continued participation". This, again, was the estoppel argument.

 DD6 argues that LNVA's past participation and financial contribution to certain drainage projects constitutes an estoppel requiring the granting of a writ of mandamus. We do not agree. In addition to the record bearing out the fact that in the past each project had been on a case-by-case basis, we think it is clear that DD6 has not at this point shown reliance to its detriment and to its damage. We conclude that this particular contention was not properly assigned in a point of error. *A fortiori*, we think that there was a lack of argument and a failure of citation of controlling authority. We con-

clude that estoppel complaints have been waived. *See San Jacinto River Authority v. Duke*, 783 S.W.2d 209 (Tex.1990); *Burgess v. Sylvester*, 143 Tex. 25, 182 S.W.2d 358 (Tex. 1944). In addition we conclude that the complaints concerning estoppel are not properly applicable to a governmental entity such as LNVA. *City of Hutchins v. Prasifka*, 450 S.W.2d 829 (Tex.1970). Estoppel is not a basis of affirmative relief here.

We interpret the recent Texas Supreme Court opinions on the doctrine of estoppel as denying estoppel as a basis for affirmative relief. *See and compare Beaumont v. Excavators & Constructors*, 870 S.W.2d 123 (Tex. App.—Beaumont 1993, writ pending).

### *"Judicial Impatience"—Not Shown*

The record mirrors that the judge reserved judgment until all the evidence was complete and completely in. Thus, we overrule the corollary contention or "subpoint" that the judge prejudged the case and made up his mind prematurely. Furthermore, the court unequivocally and emphatically announced:

But what I was attempting to do yesterday was to clarify for everybody what my thinking was at this stage, and I think I certainly am reserving and will continue to reserve judgment until I hear the rest of the evidence as far as whether or not there appears to have been arbitrary and capricious action on behalf of the LNVA.

But that remark had to do with previous witnesses and not the future witnesses proffered on June 10th and thereafter. Thus, sanguinely, we overrule the corollary point or "subpoint A" that the court made its decision prematurely. We also overrule the corollary or "subpoint" of error "B" because we conclude that subpoint "B" is not correct or sustainable. The proper inquiry in a mandamus proceeding is not whether there may exist some evidence to support DD6's cross-claims. The "some evidence" test is simply not applicable to a petition for an action based strictly on mandamus relief—because legal duties are questions of law.

### The Privilege Question

■ Additionally, the DD6 complains that the trial court fell into error by refusing to permit "direct proof" of LNVA's board's arbitrary and capricious decision-making. "Direct proof" meant mental and thought processes. DD6 announced that as to one witness, a Mr. Georgas, a LNVA director, would testify that he relied mentally, totally on the finance committee's report and also he relied upon the legal opinions. The court announced that it would sustain an objection based on the legislative privilege as to that type of testimony. The trial court reiterated that it would sustain an objection to the testimony as to what the other LNVA directors would give concerning their mental processes. LNVA urged legislative privilege, citing the case of *Mayhew v. Town of Sunnyvale,* 774 S.W.2d 284 (Tex.App.—Dallas 1989, writ denied), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 963, 112 L.Ed.2d 1049 (1991), because individual legislators may not be questioned to determine the evidence upon which they relied or their reasons for voting a particular way or their mental, thought processes. The objection was also based on subjective knowledge which subjective knowledge was irrelevant to the determination of the validity of the legislative acts of the board. The board's decisions expressed its collective will. We conclude the trial court's ruling on privilege was correct.

### The Repudiated Lorino Rule

■ DD6 in arguing its "some evidence" points also relies basically upon the *Lorino* rule; but the Supreme Court abandoned the *Lorino* rule in *Qantel Business Sys. v. Custom Controls,* 761 S.W.2d 302 (Tex.1988). In *Qantel,* the Supreme Court held that the trial judge acting and sitting as both a fact-finder and the judge of the law may rule upon both factual and legal issues at the close of the plaintiff's case. The *Lorino* rule, as set out in *Lorino v. Crawford Packing Co.,* 169 S.W.2d 235 (Tex.Civ.App.—Galveston), *aff'd,* 142 Tex. 51, 175 S.W.2d 410 (1943), was criticized because it fosters judicial inefficiency. The Supreme Court decided that when a plaintiff rests and indicates that he does not desire to put on further evidence (except by way of possible rebuttal), then the defendant should not be forced to put on a defense on the unlikely chance that it will in some manner inadvertently raise issues favorable to the plaintiff's claim. The Supreme Court wrote:

> No useful result obtains by having the court hear the defendant's evidence *when the judge, as trier of fact, is unpersuaded by the plaintiff's case. A more judicially efficient and economical procedure is to allow the trial judge, sitting as trier of fact and law, to rule on both the factual and legal issues at the close of the plaintiff's case and to make factual findings at that time if requested by a party.* (emphasis added)

Therefore, the Supreme Court sustained *Qantel's* point of error attacking the continuing viability of the so-called *Lorino* rule. The Supreme Court announced that abandoning the *Lorino* rule was in conformity with the purpose and with the spirit of the Texas Rules of Civil Procedure, citing Rule 1, and quoting this part of Rule 1:

> To the end that this objection may be attained with as great *expedition and dispatch and at the least expense* both to the litigant and to the state as may be practicable, these rules shall be given a liberal construction. (emphasis theirs)

Thus, under this record the trial judge has ruled on the insufficiency of the evidence as well as the duty issue. The trial judge was not persuaded that the plaintiff had made his case and further, that the plaintiff had failed to discharge his burden of proof to persuade the trial judge to rule favorably towards the plaintiff.

### The Issue of Arbitrariness

■ We determine that the trial court correctly ruled that the LNVA directors were not acting capriciously or whimsically or arbitrarily when they made their determinations based upon the totality of the infor-

mation that was presented to them. As well, the judge as trier of fact concluded and found that the financial report and the legal opinions as well as other matters presented to the board were adequate so that a decision based thereon lacked the quality of being arbitrary, capricious, and whimsical. In essence, counsel for DD6 conceded that the LNVA directors had discretion but argued that there was a limitation to that discretion. Counsel stated: "In other words, there has to be some reasonableness in his action." And as an ultimate decision, the trial court found that there was reasonableness in the action of the LNVA. We agree.

The trial court found: (1) there has been no believable evidence presented that the former or current directors of the Lower Neches Valley Authority acted arbitrarily or capriciously; and (2) there was no believable evidence that supports Drainage District 6's allegation that the Lower Neches Valley Authority is estopped. We agree with these findings and holdings. These were augmented later.

We determine that in the past these similar projects were submitted to LNVA on a case-by-case basis and there had been refusals by LNVA. In one project LNVA performed the work but only on the proviso that DD6 would pay 100 percent of the total costs. That was and is a refusal.

### Director Horn's Testimony

We note from the testimony of Mr. Horn who was a director of DD6 that DD6's letter dealing with the fifteen or sixteen crossings *was a request* and not a demand. According to Mr. Horn's testimony, spoken with contain admirable candor and complete, refreshing openness, it was shown that the rest of the DD6 directors, as well as Mr. Horn, viewed the letter of May 16, 1985, as a *request and that the cross-action filed by DD6 against LNVA was the first real demand.* This demand was made by a formal pleading of a cross-action in court and this cross-action was taken principally, if not solely, on the advice of counsel of DD6.

This director was very familiar with the China area. DD6 had substantially augmented the drainage system around China. He personally did not have any thought of filing suit against LNVA. DD6 started a major project concerning the flooding around China. As far as the law suit against LNVA is concerned, it was this director's opinion that DD6 had cross-claimed against LNVA because he felt like and the board felt like that DD6 was not fully responsible for the flooding or for the blocking of the drainage in that area. But his testimony reveals that a new ditch had been dug in the China area as well as a diversion ditch and DD6 had cleaned out both sides of the South China Road ditches trying to divert the water in a southerly direction. Larger pipes had also been installed. This area involving China and involving the Theriot ditch and the South China Road was in the same area that was known as the China marsh. We find in the record:

A. I've heard that term used since I've lived out there.

Q. And the China Marsh was evidently drained probably by Drainage District 6 when they drained out—dug those big ditches?

A. If you choose to use that term, *I would say yes, sir.* We're the only drainage district out there. (emphasis added)

Thus the natural drainage was substantially changed.

However, in the case of LNVA, the directors acted on the report of a finance committee, on engineers' reports, on financial reports, and on more than one legal opinion of both general counsel and special counsel. Query: If DD6 acted in bringing a cross-action for mandamus on the fifteen or sixteen crossings against LNVA based on its attorney's opinion, then why was it arbitrary and capricious for the board of directors of LNVA to make their decision based on their finance committee's recommendations, financial reports, engineers' reports, joint discussions and meetings with the directors of DD6 and at least two opinions of LNVA's own

counsel? We agree that neither LNVA nor its board of directors acted arbitrarily or capriciously.

The LNVA actions and decisions, the court found, were based on carefully thought-out discussions and diligently thought-out decisions based upon evidence and record before it which was based, inter alia, upon staff recommendations and upon legal opinions and—"made exactly the same way the Drainage District 6 directors tell you that they make their decision." That is a very important statement which the record amply supports and sustains. The trial court, after listening to voluminous testimony, determined that the DD6 Board of Directors made their decisions and reached their opinions in the same way that LNVA did. The LNVA Board had the discretion to make the decisions it made and clearly LNVA was acting in its discretion when it accepted two of the fifteen or sixteen requests. The court stated that by the same discretion, LNVA decided that the remaining thirteen were not prudent and were not approved. We overrule point of error number one.

### Appellant's Points of Error Two and Three

■ DD6's point of error number two reads: "The Trial Court Erred in Refusing to Permit Direct Proof of the LNVA Board's Arbitrary and Capricious Decision–Making." Point of error number three was: "The Trial Court Erred in Refusing to Permit Direct Proof of the LNVA Board's Abuse of Discretion." As a corollary DD6 avers "judicial impatience" against the trial court. As noted above, we have approved the rulings on privilege. Judicial patience was displayed. Points two and three are overruled. We also conclude that the appellant's points of error two and three are not presented as the Rules of Appellate Procedure require. They lack appropriate argument and authorities. Unappealability resulted. We conclude that Tex.R.App.P. 74 (which sets out the prerequisites of a brief) was simply not followed.

### Were the Participations of LNVA in Costs and Constructions Merely Ministerial?

■ But for an act to be ministerial in nature the law must clearly spell out not only the power and duty but how the duty is to be executed and performed. The description of the execution and the performance of the duty must be set out with that degree of certainty that leaves nothing at all to the exercise of discretion. Depoyster v. Baker, 89 Tex. 155, 34 S.W. 106, 107 (Tex.1896); Lampson v. South Park Ind. School Dist., 698 S.W.2d 407, 423–24 (Tex.App.—Beaumont 1985, writ dism'd).

■ Furthermore, the determination of whether a strictly defined non-discretionary or mere ministerial statutory duty is properly subject to a writ of mandamus constitutes a legal question—it is not a factual issue. Johnson v. City of Fort Worth, 774 S.W.2d 653, 656 (Tex.1989); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671 (Tex. 1979).

■ For a mandamus to properly lie, a power or an empowerment that has been granted to LNVA must be coupled with language that mandates and directs how specifically that empowerment must be carried out. We do not construe the Texas Constitution nor the enabling statute (article 8280–103), nor section 11.086 of the Water Code as containing the necessary language requiring the affirmative execution of the power. The provisions of article XVI, § 59 are not self-executing and are not self-enacting.

The Supreme Court reasoned that no such duty (as involved in this mandamus) was or could have been delegated to the judicial branch of government. See City of Corpus Christi v. City of Pleasanton, 154 Tex. 289, 276 S.W.2d 798 (1955). The City of Corpus Christi case dealt with types of conduits and reservoirs that may be used for the transportation and storage of water. The reasoning and rationale of City of Corpus Christi are very persuasive. Article XVI, § 59 simply fails to delineate means and methods of affirmative action by which flooding is to be regulated or controlled. When there are fifteen or sixteen projects involved, costing an uncertain amount of money but approximating $1,000,000 or $1,816,000, much more than

ministerial acts are involved. The crucial letter of May 16, 1985, calls for $1,816,000 for the first nine projects only. The fifteen or sixteen projects required *an estimated $2,065,000.*

One of the LNVA directors testified that one of the major functions of LNVA was to furnish water for the first flushing of rice and for the second flushing of rice and, therefore, salt water had to be kept out of the LNVA canals. The salt water problem involved putting up certain temporary barrier dams in the Neches River that cost anywhere from $200,000 to $300,000 during certain years when the salt water problem arose. A director pointed out that it was necessary to place a barrier a few years back on one day and then the barrier was actually washed out that night. The minutes of LNVA's board of directors reflected that a special meeting was called, inviting Jefferson County Drainage District No. 6 to attend and participate, if DD6 wished. LNVA's board would reconsider the request of DD6 request to participate in the modification of the crossings. DD6's arguments about the barrier contingency funds do *not* show abuse of discretion. It was reasonable, necessary and prudent to have this contingency reserve fund available because it was needed to prevent the invasion of salt water. Salt water would also damage industry and human beings living in the served towns and cities. This director pointed out that the board had carefully created a budget committee, an insurance committee, a water rates committee, an industrial development committee, a personnel committee, a nominating committee as well as an important finance committee. And these committees were in place in the year 1983.

### The Similarity of LNVA and DD6 in Making Decisions

Importantly, witness Horn testified that he individually as a member and the Board of DD6 made their decisions based on what the DD6 board received as information from the manager and staff. There were specific times when the DD6 Commissioners would suggest that their employed staff investigate a specific problem. But, basically it was true that DD6 Commissioners based their decision on staff recommendations and on DD6's lawyer's recommendations. We find in the record:

Q. And you take into consider [sic] their recommendation to both the staff and their attorneys *and then make your decision in your discretion; is that right?*

A. That's correct. (emphasis added)

Query: Since this was the same manner or method by which the directors of LNVA arrived at their decisions, how could LNVA's directors be acting in a arbitrary, capricious, whimsical manner? We perceive the record openly and clearly demonstrates that both DD6 and LNVA and their directors utilized the same types of materials, staff reports, and consultations with their own professionals for advice and decision making. LNVA and DD6 arrived at their decisions, opinions, and actions in essentially the same manner. An interesting exchange took place from this DD6 commissioner and opposing counsel concerning the letter sent by DD6 to LNVA involving the fifteen or sixteen crossings.

Q. Well, you know, I don't want to be here two weeks later to find out that really this wasn't an authorized action of the Board—this demand.

A. May I comment, sir?

Q. Yes, sir.

A. You have characterized this letter as a demand all through these proceedings and we certainly didn't look at it as a demand because of a response to Mr. Broussard's request for a list of these crossings and our opinions about what needed to be done.

Q. All right, sir. The only thing that I know is you sent the list and the next thing we knew we were sued. It doesn't say in there, does it, that this is just an opinion. It's a demand, isn't it?

A. I don't see whether it says "demand" or "opinion."

Q. This letter speaks for itself. Would you agree with me, sir, that the next communication that the LNVA received from Drainage District 6 was a cross claim for all 16 of these?

A. I spoke to that early on when I said what precipitated the cross claim—or if that's the correct term—legal—was the suit filed with Mr. Clark.

Q. And Mr. Clark only asked about A–1?

A. I think so.

Q. A Drainage District 6 asked about A–1 through F–1—or I–1 and A–2 through F–2?

A. That was—again, if I recall, *that was in conjunction with legal advice; and I really don't know how all this got into the suit and all the in's and out's of that type of thing.* (emphasis added)

Again, obviously the law suit was brought upon DD6's legal counsel's advice. Thus, the cross action and the resulting litigation was brought by DD6 upon the advice of its legal counsel—but that is the same or very similar position and method used by LNVA. LNVA depended upon both its general counsel's advice and its special counsel's advice. Hence, no capriciousness, arbitrariness, or whimsicalness is demonstrated. Certainly this candid, open, and forthright witness showed that the matters, drainages, and areas involved had been changed drastically by the "hands of man".

Under the record, any flooding problems were caused by development or increased utilization of the land. LNVA conceded that it had participated with various agencies such as the State of Texas, the county, the City of Beaumont, DD6, DD7, the Corp of Engineers in the past but had always done so strictly on a case-by-case basis. LNVA's participation has been consensual. In the past, LNVA had done some of the work much cheaper than a commercial independent contractor. In connection with the fifteen or sixteen crossings DD6 had a master plan. But that master plan had not been seen by or furnished to the LNVA until the litigation was initiated. Even at trial time, the entirety of the master plan had not been proffered to LNVA. *Noteworthy is the clear evidence that LNVA and DD6 and their respective directors employed similar, if not identical means, methods, and procedures in the making of decisions.*

 The settled rule is mandamus will issue to correct only a clear abuse of discretion or the violation of a duty imposed by law where there is no other adequate remedy at law. *Garcia v. Peeples,* 734 S.W.2d 343 (Tex.1987). Therefore, an abuse of discretion must be shown to have been committed by the trial bench. None is shown here. The test for measuring abuse of discretion is a question of *whether the court acted without reference to any guiding rules or any guiding principles. Clear Lake City Water Auth. v. Salazar,* 781 S.W.2d 347 (Tex.App.—Houston [14th Dist.] 1989, no writ).

DD6 cites and relies on *Nueces County Drainage & Con. Dist. No. 2 v. Bevly,* 519 S.W.2d 938 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.). *Nueces County* gives no aid or comfort to DD6. There a *private landowner* sought relief against the enlargement of an existing drainage ditch, partly within the defendant drainage district. There the *private landowner* was restricted to his damages remedy. The Nueces County Drainage District was constructing and enlarging an existing ditch and the central question was whether it had the power to do so. That question is altogether different from the one presented in this mandamus appeal sub judice. There the drainage district had decided and wanted *to exercise its power and its grant of empowerment in an aggressive, affirmative method.* In our case, LNVA has declined to do so with the exception of two or three projects. The granting of an empowerment does not include the mandatory carrying out of that same empowerment. The granting of a power does not, without further language, impose a positive, affirmative, aggressive duty.

### The Amended Findings of Fact and Conclusions of Law Question

 DD6 attacks the amended findings and conclusions in points of error four, five,

six, and seven. DD6 argues that the trial court erred in filing amended findings of fact and conclusions of law after the expiration of the trial court's plenary powers. Specifically, the Drainage District charges that under Rule 297 the trial court failed to timely amend its findings of fact and conclusions of law, although DD6 concedes that the trial court entered an order granting and allowing additional time for the DD6 to object to the findings of fact and conclusions of law. Nevertheless, DD6 argues that this order simply had no effect. As a corollary proposition, DD6 delivers the additional argument that LNVA's notice of request for additional and amended findings of fact and conclusions of law was made pursuant to a void order which extended certain time limits. DD6 argues that this order was likewise of no effect.

DD6 initiates its argument by stating that the trial bench filed amended findings of fact and conclusions of law on November 17, 1992. DD6 points out that the judgment in the case was signed on June 30, 1992. The bench pointed out that after fully considering the pleadings, the evidence, the arguments and the authorities of both counsel (and in response to a request from LNVA) made and filed its amended findings of fact and conclusions of law.

Significantly, the trial court in an amended finding found that the Beaumont Irrigation Canal was built in 1899 and the Neches Canal in 1902 and that the LNVA was and is the successor in title to those canal companies. In these amended findings, the trial court found that all the canals with one exception were in place by 1913 and there existed no evidence to show at that time— 1913 and for years later—that there were not adequate crossings of the natural drainages in place under or over these canals when they were built and completed.

A further finding was that from 1958 through 1981 *upon request* from LNVA to DD6 the construction, repairs, maintenance and replacing of drainage structures beneath the canals was cost-shared between the two entities. *At the discretion of each entity* the

total cost of these projects from '58 to '81 were agreed to and the participation in the total cost varied from 20 percent to 60 percent of the said total cost being allocated against DD6. However, such allocation was made at the consensual discretion of DD6 and LNVA.

But DD6 reiterates that the trial court's power *to make findings and conclusions lasts for only 90 days* or until September 28, 1992, citing TEX.R.APP.P. 41(a)(1), 46; TEX. R.CIV.P. 329b. Rule 41(a)(1) deals mainly with giving security for costs on appeal or for the filing of the bond with the clerk. Rule 41(a)(1) is devoid of time limitations as to amended findings and conclusions. TEX. R.CIV.P. 329b concerns motions for new trial on judgments following a citation by publication.

After a review of the record and controlling authorities, we conclude that the expiration of the trial bench's "plenary power" over its judgment does not affect or diminish the trial court's ability to make and file amended findings of fact and conclusions of law. Noteworthy and significant is the proposition that we are not dealing here with the actual judgment of the trial court, but only with amended findings of fact and conclusions of law.

The record, we perceive, discloses that the appellant DD6 has failed to demonstrate harm caused by the trial court's timing of its amended findings and conclusions. In *Morrison v. Morrison*, 713 S.W.2d 377 (Tex. App.—Dallas 1986, writ dism'd), that unanimous Court of Appeals, pronouncing its opinion through Justice Guilliot, concluded this:

We conclude that when a court files belated findings the only issue that arises is the injury to the appellant, not the trial court's jurisdiction to make the findings. Additionally, we find no language in rule 298 that precludes a judge from responding to an untimely request for findings.

■ In *Morrison*, the Court held that TEX.R.CIV.P. 298 simply does not preclude the trial court from issuing belated findings

of fact. If a judge files belated findings and conclusions, then the objecting litigant must show harm and injury. An example of such harm would be that the litigant was unable to adequately present his appeal. But even then, the remedy is for the appropriate appellate court to consider abating the appeal until the trial judge can consider additional findings. *See and compare Wallen v. State*, 667 S.W.2d 621 (Tex.App.—Austin 1984, no writ).

■■■■ Under well-established decisional precedent, any conflict between the original findings and the amended findings are resolved definitely in favor of the later findings. *See Redman v. Bennett*, 401 S.W.2d 891 (Tex.Civ.App.—Tyler 1966, no writ). Under this record the appellant has had a full opportunity to adequately present his appeal and has done so. The trial court was not acting to grant a new trial or vacate, modify, correct, or reform its judgment. We, therefore, conclude the DD6 has not discharged its burden in showing harm, and, in fact, has failed to show harm. No reversal of the judgment is indicated. TEX.R.APP.P. 81(b)(1). The trial court's amended findings of fact and additional amended conclusions of law were included in the transcript. Simply put, they are in the record before us and, we conclude, properly so.

DD6's request for the preparation of the transcript and what was to be included therein was filed on December 23, 1992. DD6's opening brief was filed in the latter part of May of 1993 after about six months had expired since the signing and filing of the court's amended findings. DD6 does not take the position that the amended findings prevented DD6 from raising any desired points of error—nor does DD6 claim it was prevented from properly or adequately presenting its case on appeal. DD6 presented a complete appeal.

We hold the amended findings are amply supported by evidence of high probative value. The amended conclusions of law are correct and affirmed. DD6's point of error four (4) is overruled. Point "4" is referred to as "II" in appellant's brief.

Since no error existed in the filing or the timeliness of the amended findings of fact and conclusions of law, the trial court did not err in denying DD6's motion to strike LNVA's request for the said amended findings of fact and conclusions of law. DD6 has failed to show harm, DD6's point of error number five is overruled.

By like reasoning, DD6's point of error number six is overruled. Again, DD6 has failed to show harm. DD6 does not contend that the amended findings and conclusions prevented DD6 from raising points of error in appeal or properly and fully presenting its case on appeal. These amended matters were included in the record before us. *See Leggett v. Brinson*, 817 S.W.2d 154 (Tex. App.—El Paso 1991, no writ).

When supplemental or amended findings and conclusions are filed in ample time to appear in the transcript, as in this instant appeal, the same are properly before our Ninth Court of Appeals. 4 McDONALD TEXAS CIVIL PRACTICE § 20.12 (1992). DD6's points of error six and seven are overruled.

### DD6's Letter of May 16, 1985

This May 1985 letter is at the core of the litigation. The letter begins: "As requested at our meeting of April 24, 1985". In the next paragraph the letter recites that the construction of the projects will extend over a period of years at a 50/50 cost sharing basis. DD6's letter then conceded that the projects might indeed amount to more than the $200,000 allocated to the LNVA for the five or six years or longer involved. And if such cost exceeded $200,000 a year to LNVA, then LNVA would pay the excess in the subsequent year. This crucial letter noted that all the crossings in the Pine Island Bayou Watershed had not yet been identified. The letter states: "As our Master Drainage Study continues *any falling into the inadequate category should be added to the list.* (emphasis added)" Thus, the letter itself contained contingencies and uncertainties since DD6's Master Drainage Study had not been completed.

In an endeavor to afford the appellant a complete and thorough review of its appeal, we concede that certain contentions and "quasi-subpoints of error" have been considered.

Having overruled all of appellant's points of error, we affirm the judgment of the trial court.

AFFIRMED.