Raymond MITCHELL, Appellant,

v.

Arnold BLOMDAHL, et ux., Appellees.

No. 14590.

Court of Appeals of Texas, Austin.

April 22, 1987.

Rehearing Denied June 10, 1987.

E. Richard Criss, Jr., Law Offices of E. Richard Criss, Jr., Austin, for appellant.

Dale E. Muller, Paul T. Morin, Austin, for appellees.

Before SHANNON, C.J., and GAMMAGE and ABOUSSIE, JJ.

ABOUSSIE, Justice.

Arnold and Pamela Blomdahl filed suit against Raymond Mitchell, alleging that Mitchell wrongfully impounded surface waters in violation of Tex.Water Code Ann. § 11.086 (Supp.1987), causing the Blomdahls' residential property to flood. Based upon the jury's verdict, the trial court found Mitchell to be liable for the flooding of the Blomdahls' property and awarded the Blomdahls' $15,650.00 in actual damages and $50,650.00 in punitive damages.

Mitchell was a member of a partnership which originally owned and developed the Forest North–3 subdivision in the early 1970's and continued to own property adjacent and to the east of the subdivision. The Blomdahls purchased a home in the southeast corner of the subdivision adjacent to a portion of the 13 acres owned by Mitchell to the east.

In developing the subdivision, drainage ditches and culverts were constructed to aid in the drainage of water. According to the testimony, natural drainage in the subdivision occurred in a southeasterly direction, so that the majority of the subdivision's water inevitably flowed across or near the Blomdahl's property. The construction of the streets, ditches and culverts throughout the subdivision, including those on the Blomdahls' property, channelled and directed the southeasterly flow of water into these ditches, increasing the volume of water flowing across the Blomdahl's property and onto Mitchell's property.

In 1980, Mitchell began dumping fill, dirt, and rocks onto his property adjacent to the subdivision. The Blomdahls' noticed that water was not draining as well off their property and notified Mitchell of the problem, but he took no remedial measures.

On May 13, 1982, during a heavy rain, the Blomdahls' house flooded. As a result, the Blomdahls filed suit against Mitchell. In October of 1984, before trial, the Blomdahls' house again flooded, and the Blomdahls amended their petition to allege an action for damages from the second flood, as well as gross negligence on Mitchell's part.

The Blomdahls pleaded a cause of action under common law negligence as well as a statutory cause of action under Tex.Water Code Ann. § 11.086 (Supp.1987), which provides in pertinent part:

(a) No person may divert or impound *the natural flow* of *surface waters* in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded. (emphasis added).

The case was submitted to the jury solely on the Blomdahls' statutory cause of action. The court's charge defined surface waters as follows:

"Surface waters" are those which are diffused overground from falling rain or melting snows and continues [sic] to be such *until it reaches some bed or channel* in which water is accustomed to flow *and ceases to be such when it enters* a water course in which it is accustomed to flow. (emphasis added).

The jury found that Mitchell was responsible for both diverting and impounding the natural flow of surface water due to the fill placed on his land, and that such action caused the flooding in 1982 and 1984. The jury also found Mitchell grossly negligent in his conduct.

Mitchell asserts that there is no evidence, or in the alternative, insufficient evidence, to support the jury's finding that he was responsible for diverting or impounding "surface waters" onto the Blomdahls' property. It is Mitchell's argument that any waters which might have been diverted or impounded by his fill and which consequently may have caused the flooding were not "surface waters" as defined in the court's charge and as required for the flooding to be actionable under § 11.086. We must agree.

The owner of a lower estate has the burden to receive waters flowing from the upper estate, so long as the water is flowing in its natural state, unhindered by the hands of man. *Bunch v. Thomas,* 121 Tex. 225, 49 S.W.2d 421 (1932); *Higgins v. Spear,* 118 Tex. 310, 15 S.W.2d 1010 (1929). If the water does not reach the lower estate untouched and undirected by the hands of man, the water is no longer surface water, and the lower estate owner will have no burden to receive such water. *Bunch, supra.*

In *Bunch,* a road was built by the county on the border between the upper estate owner and the lower estate owner. The road caused water to back up onto the upper estate owner's property. To remedy

the problem, the county cut a concrete dip in the road, allowing the water to flow through the road and onto the lower estate owner's property. The lower estate owner then raised a levee to block the flow of the water coming through the dip in the road. As a result, the upper estate owner's property flooded. Suit was filed by the upper estate owner pursuant to the predecessor of § 11.086, art. 7589a of the Texas Revised Civil Statutes. The court held that the lower estate owner had the right to erect the levee to keep the unnatural flow of water from running onto his property. The court stated that the servient estate's burden to receive water pursuant to art. 7589a only applied to water flowing in its natural state, unhindered by man. *Id.* 49 S.W.2d at 423.

Similarly, in *Bishop v. Harris*, 669 S.W.2d 859 (Tex.App.1984, writ dism'd), the upper estate owner constructed building and parking lots upon his property, which accelerated the flow of water onto the lower estate owner's land. The lower estate owner then built a retaining wall on the common boundary which caused water to back up onto the upper estate. The upper estate owner filed suit, contending that the lower estate owner violated § 11.086(a) of the Water Code. The court held that while the lower estate has the burden to receive surface waters from the higher estate, such a burden only exists when the water reaches the lower estate untouched and undirected by the hands of man. Since the evidence showed that the water flow onto the lower estate owner's property was concentrated and accelerated by the construction of parking lots and buildings on the upper estate owner's property and thus did not fit the definition of surface water, there was no violation of § 11.086. *Id.* at 861.

■ In the present case, it is undisputed that the water flowing onto Mitchell's property from the subdivision was not entering onto his land in its natural diffused state, but was instead being directed onto his property at a higher rate and in substantially greater amounts than the water would have flowed without the drainage system of streets, ditches and culverts in the subdivision. The Blomdahls argue on appeal that because Mitchell himself caused the ditches and culverts to be constructed in the subdivision when it was developed, Mitchell should be burdened with the duty to receive the drainage flowing from the subdivision onto his property. However, by making this argument, the Blomdahls in effect concede that the water which was flowing from their property onto Mitchell's property was neither undirected by the hands of man nor "surface water" as defined by the court's charge.

The Blomdahls also make the related argument that under the language of *Bunch, supra,* and other cases concerning a lower estate owner's duty to receive surface waters, the lower estate owner only has a right to protect his property from the waters flowing from the upper estate when the natural flow of the water has been altered by the acts of "others." Apparently by this argument, if an unrelated party now owned Mitchell's property, he would have no liability, though Mitchell should. However, we do not construe *Bunch* and its progeny in such a way.

The courts have consistently interpreted § 11.086 and its predecessors as burdening lower estate owners only with receiving the natural flow of surface waters. The statute's original predecessor was first enacted in 1915. From 1889 to 1915, the courts of this state applied the common enemy doctrine, which was adopted in *Gross v. City of Lampasas*, 74 Tex. 195, 11 S.W. 1086 (1889). Under the common enemy doctrine, property owners had the right to do whatever they felt necessary to protect their property from the flow of water, including surface waters. The enactment in 1915 of the statute which burdened lower estate owners with the duty to receive surface waters therefore gave upper estate owners a special legal right which they had not previously enjoyed. While the Supreme Court stated in *Kraft v. Langford*, 565 S.W.2d 223 (Tex.1978), that the statute is a codification of the civil law rule, and that land owners who derive their titles from Spanish or Mexican land grants are governed by the civil law rule, independent of

the statute, the Blomdahls submitted only their statutory cause of action to the jury. The statute gives them the special right to allow only the natural flow of their surface waters onto lower adjacent property. The cases which have applied this statute, in stating that a lower estate owner has a right to protect his property from water whose flow has been altered by "others," are merely applying the facts of their respective case to the applicable rules.

This is not to say that circumstances could not exist which may estop a lower estate owner from stopping the flow of unnaturally diverted water onto his property. As stated in *Allely v. Fickel*, 49 N.W.2d 544 (Iowa 1951), except for the burden of natural drainage, a lower proprietor is not required to receive drainage diverted in his direction by artificial means, *in the absence of circumstances estopping him* from objecting thereto. However, as already stated, the Blomdahls only asserted their rights under § 11.086, and did not plead or submit jury issues on an estoppel or any other theory.

The statute imposes a burden on lower estate owners to receive, and only prohibits diverting or impounding, *the natural flow of surface water*. If the water has been altered by the hands of man so that it flows in greater quantities or in a directed, accelerated or condensed manner, or if, as the trial court defined, the water has reached a bed or channel in which it is accustomed to flow, then the lower estate owner's burden ceases. The question then becomes whether or not the waters which flooded the Blomdahls' property were surface waters, and if so, were they diverted or impounded by Mitchell.

In considering a no evidence point, the reviewing court must reject all evidence contrary to the jury's findings and consider only the facts and circumstances which tend to support those findings. *Renfro Drug. Co. v. Lewis*, 149 Tex. 507, 235 S.W.2d 609 (1950). The jury found that Mitchell diverted and impounded surface water. However, the evidence conclusively shows that the water which flooded the Blomdahls' property was not "surface water" as defined by the trial court. All the evidence established that the surface water from the rains flowed into the artificial drainage system and onto Mitchell's property in an accelerated state, and in greater quantities, due to the ditches and culverts in the subdivision, and then backed up due to "daming" by appellant. Even the Blomdahls' expert hydrologist testified that 99% of the water which caused appellees' flooding backed up from that flowing in the ditches and the street runoff of the subdivision. The same hydrologist further testified as follows:

Q: ... would it be fair to say that because of the drainage system that's in out there, with the bar ditches running everything and concentrating it down there that it passes that point at a higher rate than if there had been no construction or anything at all out there and it was in its natural state?

A: Yes.

Q: In fact, because of the bar ditches and because of the design in there, it's a substantial increase in the amount of water that's designed to go down to that place, is it not?

A: That's right.

Q: In addition to that, the water that comes onto Mr. Mitchell's land from that area comes in a different way or different manner than it would have if the natural flow were there.

A: Yes.

\* \* \* \* \* \*

Q: And the volume of water that's entering his land is a much greater volume than would have gone onto his tract had improvements not been out there.

A: That is right.

Q: And, in fact, isn't it the purpose of the bar ditches and the culverts and those kinds of devices to artificially direct the flow of the drainage?

A: Yes sir.

Appellees' hydrologist also testified that because of the bar ditches, the asphalt streets and the culverts, the flow of water

onto Mitchell's property would be increased by approximately 10 times.

Under *Bunch, supra,* and its progeny, the waters flowing in the drainage ditch were not surface waters in their natural flow, since they were directed by the hands of man. More importantly, the waters flowing in the ditches were not surface waters as defined in the court's charge, since they were no longer falling rain diffused overground but had instead ceased to be surface waters once the water reached a bed or channel.

Appellees cite the case of *Musquiz v. R.M. Mayfield and Co.*, 590 S.W.2d 742 (Tex.Civ.App.1979, writ ef'd n.r.e.), for the proposition that in developed areas, the normal flow at the time of diversion is determinative as to whether water is surface water. Appellees argue that the man-made ditches and culverts running throughout the subdivision constituted channels and courses in which water was normally accustomed to flow prior to diversion. By the court's definition, however, surface waters cease to be such once they enter a bed or channel in which they are accustomed to flow, in this case, the culverts, streets and drainage ditches. Furthermore, all the evidence presented by the Blomdahls was that the fill on Mitchell's property caused the water in these ditches to back up. Therefore, the water which flooded the Blomdahls' property was not surface water as defined in the charge. There was no evidence that the increased elevation of Mitchell's property caused by his dumping of fill dirt resulted in increased run off or in an increase of surface water falling on his property and flowing from his property onto the Blomdahls' property. Since there is no evidence that any water which was diverted or impounded by Mitchell was surface water, Mitchell cannot be liable under § 11.086. Mitchell's first point of error is sustained.

In reviewing factual sufficiency points, the reviewing court should consider all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). This Court has considered all of the evidence, much of which has been previously detailed. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). Without repeating our previous discussion of the record, this Court has concluded that, had it been necessary to address Mitchell's point of error asserting that there was insufficient evidence to support the jury's finding that Mitchell caused the impounding and diversion of surface waters, we would have sustained it. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Texas L.Rev. 361, 371 (1960).

The Blomdahls may well have had a cause of action against Mitchell based upon common law negligence or other theories not alleged and which might have been supported by the evidence if submitted to the jury. Since we find, however, that there was no evidence to support the jury's finding that surface waters were diverted and impounded by Mitchell, and further, since the jury's finding of gross negligence was premised upon such a finding, judgment of the trial court is reversed and judgment rendered that Arnold Blomdahl and wife, Pamela Blomdahl, take nothing.

GAMMAGE, Justice, dissenting.

I dissent. The Blomdahls seek to recover under Tex.Water Code Ann. § 11.086 (Supp.1987), which provides:

(a) *No person* may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the *property of another* by the overflow of the water diverted or impounded. (emphasis added).

Originally, *surface water* drained to the southeast over the property later developed into a subdivision by Mitchell and his partners. It is undisputed that Mitchell and his partners constructed the ditches and culverts which increased and diverted the flow of water and made it unnatural. No one objected to this primary diversion so long as the water was permitted to drain unobstructed across the Blomdahls' property.

But when the *same person* (Mitchell) who diverted the surface water into these channels and culverts then erected obstructions which impounded and further diverted the same water causing it to overflow and damage the property of another (the Blomdahls) objections were clearly and repeatedly raised and a cause of action arose under § 11.086.

To allow Mitchell to escape liability for the damages he has inflicted upon the Blomdahls on the specious ground that it was permissible for him to dam up water flowing onto his "lower estate" because the waters were channelized and diverted by "the hands of man" on the "upper estate" ignores the fact, obviously apparent to the jury, that the "hands" involved were his.

*Bunch v. Thomas*, 49 S.W.2d 421 (Tex. 1932) is distinguishable in that neither the owner of the upper estate nor the owner of the lower estate in that case diverted the surface water. The county did; and the lower estate owner was entitled to protect his property from water unnaturally diverted onto it *by a third party*—the county.

In *Bishop v. Harris*, 669 S.W.2d 859 (Tex.App.1984, writ dism'd), it was the owner of the upper estate who, by constructing buildings and parking lots, unnaturally accelerated and concentrated the flow of water onto the lower estate, endowing the lower estate's owner with the right to protect his property from the water so diverted *by another*.

The majority acknowledge the Blomdahls' argument that lower estate owners have a right to protect their property only from water diverted by "others," but reason that the right of the lower estate owner exists "regardless of who altered the water flow." The majority further reason that the flooding water, once initially diverted into bar ditches and culverts by Mitchell, ceased to be "surface waters," and invested Mitchell with the right to protect his own lower estate property against the water *he* diverted there regardless of what injury might result to innocent property owners in the diverted water's path. Such reasoning is contrary to the purpose of the statute and in this case produces an inequitable and unjust result.

I believe the jury properly adopted the common sense reasoning that Mitchell was responsible for his actions as a single transaction—that when he impounded water with the fill on his lower estate he was impounding *surface water* over which he had taken initial control and diverted as owner and developer of the original upper estate. Viewed from this perspective, there is sufficient evidence to support the jury's finding. I would affirm the judgment of the trial court.