# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00463-CV

---

**Golden Corral Corp. and ZG GC Austin L.L.C., Appellants**

**v.**

**Noble Austin Apartments L.L.C. d/b/a Ladera Apartment Homes, Appellee**

---

**FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-GN-16-001957, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Golden Corral Corp. and ZG GC Austin L.L.C. (collectively, Golden Corral) appeal from a judgment in favor of Noble Austin Apartments L.L.C. d/b/a Ladera Apartment Homes (Ladera). The trial court rendered judgment consistent with the jury verdict finding Golden Corral liable for violating section 11.086(a) of the Texas Water Code and finding damages in the amounts of $160,000 in repair costs; $52,000 in loss of use of property; and $835,000 in diminished value of property. On appeal, Golden Corral challenges the legal sufficiency of the evidence supporting the liability finding and the damages findings as to the repair costs and the diminished value of property but does not challenge the evidence supporting the damages finding as to loss of use. We conclude that legally sufficient evidence supports the liability finding, that no evidence supports the damages award for diminished value of property, and that legally sufficient evidence supports some but not all of the damages award for repair

costs, and we therefore suggest a remittitur of $120,228.54 for the unliquidated damages award for repair costs. Accordingly, we reverse and render a take nothing judgment on damages for diminished value of property; we reform the trial court's judgment as to the damages award for repair costs; and, as reformed, we affirm the judgment (other than the diminished value damages award) conditioned on Ladera filing this remittitur within 30 days of the date of this opinion.

## BACKGROUND

In 2014, Ladera purchased an 11-building apartment complex (the Ladera Property) and signed an apartment management agreement with the company GREP South, LP (Greystar) to manage the apartments. Building 11—the relevant building for this appeal—is in the northwest corner of the Ladera Property. At the time of the purchase, the lot to the west contained a public drainage easement and the lot to the north was undeveloped. In 2015, Golden Corral constructed a restaurant on the northern lot. The restaurant includes a concrete parking lot, rain gardens, and an earthen swale (a manmade shallow ditch). During rainfall, rainwater would flow from the concrete parking lot into the rain gardens. To prevent direct dispersion of pollutants, the rain gardens were designed to retain rainwater until they fill to a certain point, and the rainwater would then exit an opening called a "weir," enter the swale, and travel along the property line to the public drainage easement. During rainfall in May 2015, October 2015, May 2016, and August 2017, two units in building 11 experienced flooding and damage.

In May 2016, Ladera sued Golden Corral for violating section 11.086(a) of the Texas Water Code.[1] *See* Tex. Water Code § 11.086(a) (prohibiting diverting, impounding, or permitting diversion or impoundment of natural flow of surface waters in manner that damages

---

[1] Ladera also sued for nuisance, negligence, and gross negligence, but the jury verdict does not support these claims and they are not at issue in this appeal.

2

property of another by overflow of water diverted or impounded). Ladera alleged that "water cannot exit from the impervious area on the [Golden Corral] Restaurant premises except by runoff over the edges of the surrounding concrete surface"; Golden Corral "utilize[d] concrete to divert water and inadequate 'rain gardens' to impound water"; "impounded surface water in inadequate collection and retention 'rain gardens' which overflowed into an area where swales were either nonexistent, inadequate or both"; and "due to a swale which is either nonexistent or of inadequate capacity, water rushes on to and causes flooding to [Ladera's] property." In January 2019, the case was tried before a jury over four days. The jury found that Golden Corral did "divert or impound the natural flow of surface waters, or permit a diversion or impounding of it to continue, in a manner that damaged the Ladera Property by the overflow of the water diverted or impounded," assigning 95% responsibility to Golden Corral and 5% responsibility to Ladera. The jury found damages in the amounts of $160,000 in repair costs; $52,000 in loss of use of property; and $835,000 in diminished value of property. The trial court rendered judgment consistent with the verdict, and Golden Corral perfected this appeal.

## DISCUSSION

On appeal, Golden Corral raises three issues. First, it challenges the legal sufficiency of the evidence supporting the jury finding that it violated section 11.086(a). Second, it challenges the legal sufficiency of the property owner's testimony to support the $835,000 amount of diminution of the property's value, arguing that the testimony was "nothing more than speculative, conclusory testimony." Third, it challenges the legal sufficiency of the evidence supporting the reasonableness of the $160,000 amount in repair costs.

3

**Section 11.086**

Section 11.086(a) provides: "No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." Tex. Water Code § 11.086(a); *see Kraft v. Langford*, 565 S.W.2d 223, 229 (Tex. 1978) (noting elements for statutory claim are "(1) a diversion or impoundment of surface water which (2) causes (3) damage to the property of the plaintiff landowner"). As the party seeking affirmative relief, Ladera bore the burden of proof at trial. *See Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984) ("It is a well-accepted postulate of the common law that a civil litigant who asserts an affirmative claim for relief has the burden to persuade the finder of fact of the existence of each element of his cause of action.").

On appeal, Golden Corral does not challenge the jury finding that it diverted or impounded waters "in a manner that damaged the Ladera Property by the overflow of the water diverted or impounded."[2] Instead, it challenges only the legal sufficiency of the evidence supporting the finding that the waters at issue are "surface waters," arguing:

> The evidence at trial conclusively established that the rain water at issue in the case was not "surface water" as it has "been altered by the hands of man so that it flows in greater quantities or in a directed, accelerated or condensed manner"' and is "under control by a ditch, tank, pond, or pipe" or similar structure—namely the rain gardens and/or the associated swale on the Golden Corral property.

The term "surface waters" in section 11.086 is not statutorily defined, although judicial definitions have been provided. *See Hopkins v. State*, No. 03-03-00499-CV, 2006 WL 1126224,

---

[2] Golden Corral frames the rain events as "unprecedented," but this is irrelevant. The jury was instructed, "If an occurrence is caused by unprecedented rainfall or an 'act of God,' it is not caused by any person." On appeal, Golden Corral does not challenge this instruction or the jury finding that the occurrence was not caused by unprecedented rainfall or an act of God.

at *12 (Tex. App.—Austin Apr. 27, 2006, pet. denied) (mem. op.) (noting "'[s]urface water' [in section 11.086(a)] has been judicially defined"). Golden Corral notes that "[c]onsistent with this well-settled law, and without objection," the jury was instructed by the charge as to the meaning of "[s]urface waters" as follows:

> "Surface waters" are those which are diffused overground from falling rain or melting snows and continue to be such until they reach some bed or channel in which water is accustomed to flow and ceases to be such when it enters a water course in which it is accustomed to flow. When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface water.

"[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *see Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Dev. & Rsch. Corp.*, 299 S.W.3d 106, 112 (Tex. 2009) (noting that when there is no objection "we assume, without deciding, that the instruction was correct and measure the evidence by the charge as given"); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) ("Since neither party objected to this instruction, we are bound to review the evidence in light of this definition.").

Since Ladera bore the burden of proof at trial, Golden Corral's appellate burden in its legal sufficiency challenge is to demonstrate that there was "a complete absence of evidence" or that the evidence offered at trial was "no more than a scintilla" to support the adverse finding on the "surface water" issue. *See Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014). Considering the evidence in the light most favorable to the judgment, more than a scintilla exists "when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions"; if the evidence creates only "a mere surmise or suspicion of its existence," however, it is regarded as no evidence. *Id.*

5

Golden Corral admits that "rainwater from the concrete parking lot flows into the rain gardens." And Ladera's maintenance supervisor Carlos Alvarez testified that he filmed the Golden Corral site during the October 2015 rainfall, and the video was admitted into evidence. He testified—and the video confirms—that during the rain, "water [was] coming off the top of the parking lot" and "flowing into that rain garden." It was undisputed that rain that directly falls on the parking lot is water "diffused overground from falling rain" and therefore surface water.[3] Thus, there was legally sufficient evidence that the waters at issue were surface waters before entering the rain gardens.

There was also legally sufficient evidence that the rain gardens impounded the surface waters coming off the parking lot, pursuant to the ordinary meaning of the undefined statutory term "impound." *See Impound, Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/impound (last visited July 2, 2021) ("[T]o collect and confine (water) in or as if in a reservoir."); *Impound, Webster's New Universal Unabridged Dictionary* 962 (1st ed. 1996) ("[T]o confine within an enclosure or within limits: *water impounded in a reservoir*."); *see also Texas State Bd. of Exam'rs of Marriage & Fam. Therapists*

_____

[3] Golden Corral points to expert testimony from Ladera's engineer that rainwater falling on the restaurant's roof is "collected in drains and diverted to the[] rain gardens." Golden Corral argues that this rainwater would no longer be "surface waters" because it is under control by the drainpipes. Assuming that this is correct, it would apply only to the rainwater from the roof, not the rainwater that fell directly on the uncovered parking lot.

Golden Corral also claims, quoting *Mitchell v. Blomdahl*, 730 S.W.2d 791, 794 (Tex. App.—Austin 1987, writ ref'd n.r.e.), that "'[i]f the water has been altered by the hands of man so that it flows in greater quantities or in a directed, accelerated or condensed manner,' then the water is no longer surface water." But Golden Corral concedes that this standard was not included in the jury instruction; that "this phrase is really nothing more than an artful descriptor for and inclusive of the concept that '[w]hen rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface water'"; and that surface water "'touched by the hands of man' and diverted or impounded by manmade changes to the land that do not control water (e.g., berms, hills, grading, etc.) . . . may maintain classification as surface water."

6

*v. Texas Med. Ass'n*, 511 S.W.3d 28, 34 (Tex. 2017) (looking to dictionaries to determine common, ordinary meaning of undefined statutory term). Golden Corral's expert testified that rain gardens are used "as a way to capture the water after the rain so we don't allow pollutants such as oil from your car; trash in a parking lot; spilled chemicals to go directly into the drain way after a storm event" and "will hold back the water from the event and release it at a rate that's designed by an engineer." And Golden Corral's corporate designee testified that "the rain gardens are really the substance of how we control runoff on that site" and that "we're just getting the water into the structures to hold and to delay, you know, it being released."

Finally, there was legally sufficient evidence that the surface waters impounded in the rain gardens overflowed in a manner that damaged Ladera's apartments. *See Overflow*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/overflow (last visited July 2, 2021) (including such definitions as "to cover with or as if with water," "to flow over the brim of," "to flow over bounds," "to fill a space to capacity and spread beyond its limits"); *see also Miller v. Letzerich*, 49 S.W.2d 404, 414 (Tex. 1932) (interpreting substantially similar predecessor statute and concluding that "[t]he word 'overflow' is, of course, capable of the meaning attributed to it by the Court of Civil Appeals—that is, 'to flow over the bounds, over the brim'—but its meaning also is, 'to flow over, to cover with or as with water or other fluid; to spread over, to inundate'"). Golden Corral's expert explained that "rain gardens retain the water until it fills to a certain point," and that the "weir, which is an opening, allows that water to exit that particular structure and pass on its way down . . . toward the drainage easement." Ladera's maintenance supervisor Alvarez's video of the October 2015 rainfall shows water overflowing out of the weir in one of the rain gardens and then shows the water traveling downhill along the fence on Ladera's side of the property, separate from the water traveling on Golden Corral's side

7

of the property; reaching a retaining wall; pouring over the retaining wall; and wrapping around to where building 11 is located, as captured by the following still shots:



As explained by Alvarez at trial, the water that came out of the weir was "flowing down" "from Golden Corral on the side of Ladera['s] property"; "the water that's coming here from the rain garden is taking a left turn at the beginning of the small black fence, crossing over those retaining wall blocks, and flowing down in what appears to be a large volume of water"; and the video shows "the water cascading down by the air conditioners and then turning around the corner of the building." Taylor Martin, a Greystar employee, testified that she went to the same spot shortly after Alvarez took the video and saw "[w]ater flowing over the concrete barrier I guess we could call it on Golden Corral's side and then that water flowing over and crossing onto our property line, and then going behind building 11." Martin explained that in her opinion

"the water at that time had drained from Golden Corral's concrete section that was more to the northeast came off of that, when it was overflowing and then crossed over our property line" and that she reached that opinion because she "physically saw it the second time." She also testified that after the May 2016 rainfall, she observed that "all of the water concrete areas within Golden Corral were max'd out and were completely full, which led me to believe there had been water, at some point, pouring over." And after the August 2017 rainfall, she observed that "all of the concrete water garden on Golden Corral's side had been completely full," "max'd out," "[t]opped out," and that "[t]here was still debris that was looking as if it had been kind of coming down the same path."

Golden Corral argues that "[t]he liability question presented is whether, under a strict liability statute, 'surface water' existed." Its legal theory appears to be that any water that overflowed the rain gardens still needed to be classified as "surface water" for a section 11.086(a) claim: "All water that fell onto the restaurant's parking lot was directed to rain gardens"; "the surface water, once *reaching* the rain gardens and/or the swale, was no longer diffused and, further, was under the control of a manmade structure"; and because the water is no longer diffused and under control, "the water's designation as 'surface water' ceases." However, although section 11.086(a) prohibits "divert[ing] or impound[ing] the natural flow of surface waters," it does not require that the overflow from such diversion or impounding maintains its classification as "surface waters." Tex. Water Code § 11.086(a). Instead, section 11.086(a) imposes liability for damages that result from "the overflow of the water diverted or impounded," regardless of whether the overflowing waters remain "surface waters." *Id.*; *see id.* § 11.086(b) ("A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned

9

by the overflow."). In other words, if the waters at issue are "surface waters" at the time of the unlawful diversion or impounding and the "overflow of the water diverted or impounded" damaged "the property of another," the waters need not remain "surface waters" when they overflow and damage the property of another for a viable section 11.086(a) claim to exist. *See id.* § 11.086(a) ("No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.").

Golden Corral relies primarily on two opinions to support its position. *See Dietrich v. Goodman*, 123 S.W.3d 413 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Mitchell v. Blomdahl*, 730 S.W.2d 791 (Tex. App.—Austin 1987, writ ref'd n.r.e.). In *Mitchell*, "natural drainage" in a subdivision flowed through ditches, "increasing the volume of water flowing across the Blomdahl[s'] property and onto Mitchell's property." 730 S.W.2d at 792. Mitchell then "began dumping fill, dirt, and rocks onto his property," which caused the water on the Blomdahls' property to not drain as well, and eventually the Blomdahls' house flooded during a heavy rainfall. *Id.* The Blomdahls sued Mitchell under section 11.086(a), the jury found in the Blomdahls' favor, and Mitchell appealed, arguing that "any waters which might have been diverted or impounded by his fill and which consequently may have caused the flooding were not 'surface waters' as defined in the court's charge." *Id.* This Court agreed, sustaining Mitchell's legal sufficiency challenge and concluding, "All the evidence established that the surface water from the rains flowed into the artificial drainage system and onto Mitchell's property in an accelerated state, and in greater quantities, due to the ditches and culverts in the subdivision, and then backed up due to 'daming' by appellant." *Id.* at 794. Thus, the "waters flowing in the ditches" that Mitchell may have been diverting or impounding through his

dumping of fill on his property "were not surface waters as defined in the court's charge, since they were no longer falling rain diffused overground but had instead ceased to be surface waters once the water reached a bed or channel." *Id.* at 795.

In *Dietrich*, rain fell on tennis courts and wooded acreage located on a country club recreational area, and the waters entered a natural gully extending to a drain opening to a storm sewer located on the Goodmans' property. 123 S.W.3d at 415–16. When the drain opening was free of debris, "it was capable of capturing and diverting over 1,000 gallons of water per minute." *Id.* at 416. After one "torrential thunderstorm," the Dietrichs—the Goodmans' neighbor—found their house flooded with water and "heavily damaged." *Id.* A subsequent investigation revealed that the drain opening "was occluded by dirt, roots, and several bricks." *Id.* The Dietrichs then sued the Goodmans, asserting a violation of section 11.086(a). *Id.* The court noted:

> When rain water fell directly on the tennis courts and wooded acreage on the night of the flood at issue, it undeniably possessed the character of surface water. When the water entered the channel leading to the storm sewer, however, its character changed. The water flowed in a well-defined bed, which led toward the drain inlet. As the rainwater flowed down the channel to the drainage inlet in the Goodmans' backyard, it was blocked by roots, mulch, and dirt. Thus, the water flowed across the corner of the Goodman's backyard onto the Dietrichs' property which had a lower elevation. Until it reached the blocked drain, the water was under the control and direction of a watercourse, and thus, it no longer qualified as surface water. As such, there was no diversion of *surface water* when the rain water was redirected from the drain inlet.

*Id.* at 420 (citations and footnotes omitted). Thus, as our sister court has noted, *Dietrich*'s holding is "limited to the fact that, under section 11.086, a landowner has no cause of action for damages arising from the diversion of a water flowing in a watercourse (in that case, a natural

11

gully) because such waters are no longer diffused surface waters." *Texas Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 283 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

In both *Mitchell* and *Dietrich*, the waters at issue had changed character so that the waters were no longer "surface waters" prior to the alleged diversion or impoundment. In fact, the waters at issue in both cases had changed their character prior to even entering the defendants' properties. *See Mitchell*, 730 S.W.2d at 793 ("[I]t is undisputed that the water flowing onto Mitchell's property from the subdivision was not entering onto his land in its natural diffused state[.]"); *Dietrich*, 123 S.W.3d at 419–20 ("[T]he water diverted onto the Dietrichs' property on account of the occluded drain was runoff from the country club property behind the Dietrichs' and Goodmans' homes. The water was concentrated and directed toward the drain by a shallow, but readily visible, natural gully, that extended sixty feet or more up into the wooded area of the country club property."). Here, in contrast, it was undisputed that the rainwater fell on Golden Corral's property as surface water. And a reasonable jury could have concluded that Golden Corral's rain gardens were impounding waters that could be characterized at the time of impoundment as "surface waters" as defined in the court's charge—i.e., the waters flowing from the concrete parking lot into the rain gardens were diffused overground; were not under control by ditches, tanks, ponds, or pipes; and had not reached a bed, channel, or watercourse in which water is accustomed to flow prior to being impounded by the rain gardens. *Cf. Texas Woman's Univ.*, 221 S.W.3d at 280–81 (evaluating summary judgment evidence for section 11.086 claim and noting that "fine line" between factual possibilities "is precisely the reason why, at this stage of the litigation, judgment as a matter of law on this issue is not appropriate" and implying that issue is more appropriate for fact finder); *Dietrich*, 123 S.W.3d at 419 (speculating that "it is still possible for a plaintiff to find relief under the statute where the

12

flow of a broad expanse of diffused surface water is diverted by a berm"); *Boatman v. Lites*, 970 S.W.2d 41, 44–45 (Tex. App.—Tyler 1998, no pet.) (holding that evidence showing that when "significant rain fall occurred, the surface water flowed across the road" and "was then diverted by the Boatmans' berm" to cause damages was sufficient to support jury's affirmative finding on section 11.086(a) claim). We therefore conclude that legally sufficient evidence supported the finding that the waters at issue were "surface waters" for Ladera's section 11.086(a) claim. We overrule Golden Corral's first issue.

**Legal Sufficiency of Diminution Evidence**

In its second issue, Golden Corral challenges the legal sufficiency of the evidence supporting the finding that the Ladera Property diminished in value by $835,000. The charge asked, "Consider the difference, if any, in the market value in Travis County, Texas of the Ladera Property in question immediately before the occurrence in question and immediately after the necessary repairs were made to the Ladera Property," and instructed, "'Market value' means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling."

Ron Therrien, as an owner of the Ladera Property, testified as to the diminution of value under the Property Owner Rule. *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157, 159 (Tex. 2012) ("[T]he Property Owner Rule is an exception to the requirement that a witness must otherwise establish his qualification to express an opinion on land values. Under the Rule, an owner's valuation testimony fulfills the same role that expert testimony does. . . . Because property owner testimony is the functional equivalent of expert testimony, it must be judged by the same standards."). Golden Corral does not challenge

13

Therrien's qualifications to testify under the Property Owner Rule or the reliability of his expert testimony; instead, it raises a no evidence challenge on appeal that his valuation testimony was conclusory and speculative. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 223 (Tex. 2019) ("A party may challenge an expert's testimony as conclusory, making a no-evidence challenge, even when the party did not object to its admissibility at trial."). To substantiate a "diminished value claim," a property owner "may not simply echo the phrase 'market value' and state a number." *Justiss*, 397 S.W.3d at 159.[4] Instead, the property owner "must provide the factual basis on which his opinion rests"—a burden that is "not onerous"—and "[e]vidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim." *Id.* However, "even if unchallenged, the testimony must support a verdict, and conclusory or speculative statements do not." *Id.* An opinion is speculative "if it is based on guesswork or conjecture," *id.* at 156, and conclusory if "no basis for the opinion is offered" or "the basis offered provides no support," *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)). Even though the jury in this case apparently found Therrien's testimony to be sufficient, "[l]egal sufficiency review requires courts to ensure that a jury that relies on an expert's opinion has heard factual evidence that demonstrates that the opinion is not conclusory on its face." *Id.* at 838; *see id.* at 829 ("This is because the evidentiary value of expert testimony is derived from its basis, not from the mere fact that the expert has said it."). With this standard in mind, we turn to Therrien's testimony.

---

[4] In *Natural Gas Pipeline Co. of America v. Justiss*, the Texas Supreme Court overruled its earlier holding that the requirement that a property owner's testimony be "based on market" is usually met "merely 'by asking the witness if he is familiar with the market value of his property.'" 397 S.W.3d 150, 155–59, 162 (Tex. 2012) (quoting and overruling *Porras v. Craig*, 675 S.W.2d 503, 505 (Tex. 1984)).

Therrien testified that Ladera acquired the apartments in June 2014 for $42.5 million and that "42.5 was a pretty good estimate of the value" of the property "at about the time of the first incidents, which would have been May of 2015." He explained that he "[c]ontinuously" monitored the market price since that time, that he was in "constant discussions with friends and brokers" as to the market price, and that when he makes determinations for Ladera concerning market value, he obtains assistance from others, including tax professionals, legal professionals, appraisers, and management companies. He testified that a future buyer has the right to ask questions of the seller, that in this case they would uncover "that building 11 has flooded 4 times in 27 months," that this flooding has "clearly negatively impacted the value," and that an investor is "going to want to pay less money for the apartment project that had flooding issues." After discussing the damages and expenditures associated with the cost to repair building 11 after the flooding, he testified that the market value "clearly decreased" because "an apartment that has flooding is worth less than an apartment that doesn't flood, so—the value went down," and "my apartments are worth less now that we've had this flooding occur than they were if we've never had the flooding."

As to "how much less they are worth," Therrien testified: "Eight hundred to a million dollars less. I made a calculation and came up to $835,00."[5] In explaining how he arrived at this calculation,[6] his testimony proceeded as follows:

---

[5] On cross examination, Therrien conceded that at an earlier deposition he did not know what "the lost market value would be for the Ladera property," explaining that "this was a complicated issue, which is what's the impact of the flooding on the value"; that "I don't think I've ever done one of these kinds of issues"; and that "I needed to think a little bit about the methodology I would apply to determine how I would come up with a number of the calculated lost market value."

Q. . . . let's focus on the—in your opinion, loss of market value from the $42,500,000 which [Ladera] paid in June of '19—June of 2014, and what you think it's worth now. I know you're not selling it now. I know it's not for sale now, but those damages which have resulted from the four flooding events have now all been repaired, correct?

A. That's correct.

Q. And, again, we know from Exhibit 10, and from Exhibit 64, and from Ms. Martin's testimony, we know that those repairs—those costs have been completed now.

A. Yes.

Q. And—and she said, on Exhibit 10, don't hold me to this figure, but approximately $208,000 was expended there, correct?

A. That's correct.

. . .

Q. And then she said on Exhibit [64] in connection with those losses pertaining to August, 2017 rain event, that the number came to roughly $19,000?

---

**6** As noted by Golden Corral's counsel when discussing in pretrial matters Golden Corral's motion for limine, "the way [Ladera] frame[s] market value" in their discovery responses "is simply a fivefold multiple of what they claim they incurred in the past." For example, Ladera's interrogatory discovery responses, which were attached to its response to Golden Corral's motion for judgment notwithstanding the verdict, explained that the diminution amount was computed by multiplying the costs for the first flooding by a "headache factor" of an additional 20%, and then multiplying that amount by five, based on a prediction that "5 to 6 flooding events" would "occur during the hypothetical five year holding period for any new purchaser of Ladera Apartment Homes." The trial court granted Golden Corral's motion for limine regarding speculative and undetermined damages, including for references to "[f]uture property damage." At trial, when Therrien initially was asked how he came up with that value, he explained that he put himself "in the shoes of the investor coming in to buy these apartments" and looked at how much it would cost "if I buy these apartments and I get flooded again, how much is it going to cost me to make those repairs, and how frequently might I incur those flooding events during the course of time that I'm going to own it as the new buyer." Therrien also testified that "there will be . . . future flooding events," that he will "have to go back in and repair those units again," and that "if I hold the apartments for another 5 years, we had 4 incidents in 27 months or something like that, so maybe I get one a year and that's five more incidents, so 5 times I'm going to have to go through and do all that work again, so that's the cost of me holding the property." Golden Corral's counsel objected to these statements, and the trial court sustained the objections based on its previous limine ruling.

A. Yes.

Q. So if we add the 208 plus the 19,000 that she said we should do, then we would come up with a rough number of $227,000, correct?

A. Yes.

Q. So is it your testimony that the market value, at least as it stands right now, in that remedied condition, is $227,000 less than it was before, at least?

A. At least. Yes. I think it's more.

. . .[7]

Q. . . . So we know that we have $227,000 of damages that have already been spent which have resulted in a diminution, a reduction of the market value, in your opinion; is that right?

A. I believe that the flooding events have caused a diminution in value of the property.

. . .

Q. What other numbers, in your opinion, as the owner—as the representative of [Ladera], what other numbers in your opinion may further reduce the market value of the Ladera Apartment Homes beyond that 227,000 represented by Exhibits 10 and 64?

. . .

A. I think the value of my apartments has decreased by $835,000 as a result of the flooding.

Q. Okay. Okay. We'll just leave it at that. What about—and that's reduced the market value with market being the key term because market implies a subsequent sale, right?

A. Yes, I think if I went to sell it, it would be $835,000 less than it would have been if I hadn't had these flooding incidences.

---

[7] At this point, Ladera's counsel asked, "[W]hat other thing would reduce that market value even further? The stigma, for example, how would that reduce it?" But an objection was again sustained based on the court's earlier limine ruling.

Therrien also testified that none of the remedial actions taken "have been enough sufficient to offset the volume of water that's coming onto my property from Golden Corral" and that "as it sits right now, it's going to flood again."

Therrien's assertions of familiarity with area market values are insufficient to make otherwise conclusory or speculative testimony legally sufficient. *See Justiss*, 397 S.W.3d at 161 (noting that "merely answer[ing] 'yes' when asked whether their numbers were based on market value" is legally insufficient when experts "never explained how they arrived at those figures" and that expert's "statement that it was 'based on property sales around in the area' provides little more detail than using the words 'market value'"); *Wood v. Kennedy*, 473 S.W.3d 329, 338 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("As in *Justiss*, the witnesses' testimony regarding their experience and respective beliefs concerning the property's fair market rental value—standing alone—are insufficient to sustain the judgment because such evidence does not indicate the factual basis behind the witnesses' valuations."). And Therrien's statements that the value has "clearly decreased" or that his "apartments are worth less now that we've had this flooding occur than they were if we've never had the flooding" are mere conclusions that do not provide any factual basis as to the amount by which the apartments have diminished in value. *See, e.g.*, *Pauli v. Hayes*, No. 04-17-00026-CV, 2018 WL 3440767, at *6 (Tex. App.—San Antonio July 18, 2018, no pet.) (mem. op.) (holding that expert's testimony that his conclusion that the property diminished in value "by twenty percent is 'absolutely' not 'just a guess' and is 'based on empirical data'" is nevertheless "a 'conclusion without explanation'" when "he did not provide any of the data he relied upon, explain the methodology of his studies, or explain how the data supports . . . the twenty percent reduction in value he asserted applies in this case"). Therrien stated that he "made a calculation and came up to

$835,000," but he never explained the factual basis for or how he calculated the $835,000 amount—an additional $608,000 amount above the alleged $227,000 amount for cost of repairs relied on in his testimony. *See Justiss*, 397 S.W.3d at 161 ("Although [expert] demonstrated his familiarity with area market values, he failed to explain the factual basis behind his determination that his property suffered a $400,000 decrease in value."); *Williamson v. Howard*, 554 S.W.3d 59, 72 (Tex. App.—El Paso 2018, no pet.) ("A valuation must be substantiated; naked assertion is not enough."). Accordingly, we conclude that legally insufficient evidence supported Therrien's conclusion that "the value of [his] apartments has decreased by $835,000 as a result of the flooding." *See Houston Unlimited*, 443 S.W.3d at 829 (noting statement is conclusory if no basis for opinion is offered); *Justiss*, 397 S.W.3d at 161 ("His testimony provides only his guess as to his property's diminution in value, and such speculation will not support a judgment."); *Wood*, 473 S.W.3d at 339 (noting that witness's "failure to state the factual basis for her conclusion makes her testimony legally insufficient to support the judgment").

Nor can we conclude that the $227,000 amount discussed by Therrien and derived from exhibits 10 and 64 serves as a basis for providing legally sufficient evidence supporting an award of damages for diminution of value, let alone the $835,000 amount. Exhibits 10 and 64 consist of invoices and receipts purportedly for costs of repairs. On appeal, Ladera argues, "Therrien testified, however, that the impact on the price a willing buyer would pay for the property was greater [than the $227,000] because the flooding issue had not been solved, and there was a likelihood of future flooding." But Therrien admitted that "those damages which have resulted from the four flooding events have now all been repaired," and Ladera

19

sought a separate award of damages for those costs of repair.[8] *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995) ("Diminution in value does not duplicate the cost of repairs if the diminution is calculated based on a comparison of the original value of the property and the value *after repairs are made*."). Therrien did not rely on any of the traditional methods for determining the change in market value after the repairs were made. *See Phillips v. Carlton Energy Grp.*, 475 S.W.3d 265, 278 (Tex. 2015) ("Fair market value is generally determined either by using comparable market sales, calculating replacement cost less depreciation, or capitalizing net income[.]"). Nor did Therrien explain at trial why the cost for repairs that have already been completed would change the market value of the property after the repairs were made.[9] *See Justiss*, 397 S.W.3d at 156 ("[A]n expert's testimony is conclusory as a matter of law if he 'simply state[s] a conclusion without any explanation.'" (quoting *Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008))). Without more, we cannot conclude that testimony of $227,000 for repairs that have already been completed rises to more than speculative or conclusory testimony supporting the award for the diminution of the market value for the Ladera Property after the repairs have been completed. *See Houston Unlimited*,

---

[8] Ladera argues that Golden Corral "offers no authorities on appeal holding that it is inappropriate to consider the costs of fixing past harms to the property when assessing the market value adjustment to reflect the diminished value of the property for a recurring issue." But Ladera bore the burden at trial to present more than conclusory or speculative statements supporting an award for diminution of market value of its property.

[9] To the extent that Ladera attempted to prove stigma damages based on Therrien's testimony that "an apartment that has flooding is worth less than an apartment that doesn't flood" and his reliance on the amount spent for repairs, *see supra* at nn. 6–7, such evidence was nothing more than "conjecture, guess or speculation" as to the amount of diminution damages, *see Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 827 (Tex. 2014) ("Even when it is legally possible to recover stigma damages, it is often legally impossible to prove them. Evidence based on 'conjecture, guess or speculation' is inadequate to prove stigma damages, not only as to the amount of the lost value but also as to the portion of that amount caused by the defendant's conduct.").

443 S.W.3d at 829 (noting opinion is conclusory if no basis is offered or if bases offered provides no support); *Justiss*, 397 S.W.3d at 156 (noting opinion is speculative if based on guesswork or conjecture).[10]

If "there is no evidence to support a damages verdict, [a court of appeals] should render a take nothing judgment as to that amount."[11] *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *see Houston Unlimited*, 443 S.W.3d at 838 (reversing and rendering take nothing judgment when expert diminution testimony was legally insufficient to support award). Ladera argues that "this Court cannot render judgment for Golden Corral," citing *Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 580 (Tex. App.—Beaumont 2008, pet. denied) (reversing judgment and remanding case instead of rendering judgment because "[a]ppellate courts may

---

[10] Ladera also relies on *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 226–28 (Tex. 2019), and *Oncor Electric Delivery Company LLC v. El Halcon Investments LLC*, No. 11-14-00164-CV2016 WL 4710445, at *5 (Tex. App.—Eastland July 29, 2016, pet. denied) (mem. op.), to argue that Therrien could rely on his experience and not cite studies or evidence "to assess the impact of flooding on Ladera's property value." But these opinions are distinguishable as they rely on testimony as to the uniqueness of appraising the property at issue or as to the difficulty in obtaining comparable values. *See Bombardier*, 572 S.W.3d at 226–27; *Oncor Electric*, 2016 WL 4710445, at *2, *4. Here, in contrast, there was no evidence as to the uniqueness of appraising apartment properties or as to the difficulty in obtaining comparable values; instead, Therrien failed to detail and explain the basis for his calculation, and the jury was left to just take his word that "I think the value of my apartments has decreased by $835,000 as a result of the flooding."

[11] Even if Therrien's testimony that the market value "clearly decreased" because "an apartment that has flooding is worth less than an apartment that doesn't flood, so—the value went down" constituted evidence that diminution damages *occurred*, Ladera did not provide legally sufficient evidence to support any *amount* of diminution damages. *Cf. Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566–67 (Tex. 2002) (noting that "[i]n determining damages, the jury has discretion to award damages within the range of evidence presented at trial" and concluding that there was "no evidence to furnish a range within which a jury could exercise its discretion to award damages," that "[t]o allow a recovery to stand without evidence of a measure of damages would risk an over-recovery or an under-recovery by a factor that would be intolerable if the verdict were not for a relatively small amount," and that "[t]he law provides for the recovery of minimal damages without the necessity of proof, but only for those actions in which nominal damages are available").

21

remand a case for a new trial in the interests of justice and have broad discretion to do so" and "the plaintiff failed to show damages with reasonable certainty, but the interests of justice required that the plaintiff be given an opportunity to establish the proper measure of damages" (citing Tex. R. App. P. 43.3(b); *Fanning v. Fanning*, 847 S.W.2d 225, 226 (Tex. 1993))). But we fail to see how in this case "the interests of justice require a remand for another trial," Tex. R. App. P. 43.3(b), when the primary reasons for remand in the interests of justice do not apply, *see Westgate, Ltd. v. State*, 843 S.W.2d 448, 455 (Tex. 1992) (describing reasons for remand in interests of justice as including "where we overrule existing precedents on which the losing party relied at trial," "where it appears from the record that the losing party might be able to recover under some other established legal theory that was not developed at the first trial," and "where we announce a new standard of recovery in the case under consideration."). Throughout this case's pendency, the law has required non-conclusory and non-speculative evidence to support an award of diminution damages, regardless of whether that evidence was challenged or objected to at trial. *See Justiss*, 397 S.W.3d at 159. Contrary to the interests of justice, a remand here allowing Ladera "to redo or supplement" Therrien's damages testimony when the relevant standard has not changed "would, without sufficient justification, provide [Ladera] 'an opportunity for another bite at the apple.'" *See Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 260 (Tex. 2004) (quoting *Jackson v. Ewton*, 411 S.W.2d 715, 719 (Tex. 1967)), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 18 & n.58 (Tex. 2008). Because we conclude that the interests of justice do not require remand, we decline Ladera's request to follow *Royce Homes* by remanding for determination of diminution damages, and instead we reverse and render a take nothing judgment on diminution damages.

**Legal Sufficiency of Repair Cost Evidence**

In its third issue, Golden Corral challenges the legal sufficiency of the evidence supporting the jury's finding that $160,000 was a reasonable amount for costs of repairs. Because Ladera bore the burden of proof on this issue, Golden Corral must demonstrate that there was a complete absence of evidence or that the evidence offered at trial was no more than a scintilla to support the adverse finding. *See Waste Mgmt.*, 434 S.W.3d at 156. A jury's finding may be upheld on circumstantial evidence as long as it may fairly and reasonably be inferred from the facts. *See Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995); *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex. 1991) ("Any ultimate fact may be proved by circumstantial evidence.").[12]

As we have already noted above, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg*, 12 S.W.3d at 55. The charge asked the jury "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate Ladera for damages, if any, to its property resulting from the occurrences in question," and as to "[c]ost of repairs," to "[c]onsider the reasonable cost in Travis County, Texas, to restore the property to the condition it was in immediately before the occurrences in question." Taylor Martin, a Greystar employee, testified as to the repair costs that were incurred, introducing certain invoices she gathered and

---

[12] Additionally, the jury instructions provided that a "fact may be established by direct evidence or by circumstantial evidence or both" and a "fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved."

23

cost summary sheets she created that were admitted into evidence. These summary sheets for repair costs totaled $156,253.54.[13]

Golden Corral raises two arguments on appeal as to the repair costs. First, Golden Corral argues that "many of the charges do not concern repairs, but rather improvements to the property," including $36,025 for the construction of a concrete culvert and French drains.[14] The jury charge expressly limited the repair costs to what will "restore the property to the condition it was in immediately before the occurrences in question." But there was no evidence that the construction costs to build the concrete culvert and French drains were "reasonable cost[s] . . . to restore the property to the condition it was in immediately before the occurrences in question." In fact, Ladera's counsel described the culvert as a "concrete improvement," stipulating that "the concrete improvement was made by Ladera" after the flooding events. And Martin explained that after the third flooding, "we realized that the culvert was not diverting enough water, and so we ended up actually installing French drains underneath the air conditioning wall or area kind

---

[13] Plaintiff's exhibit 10 consists of a binder that includes a summary of costs from the following relevant tabs/exhibits with attached itemized service invoices following each tab: tab B/exhibit 12 totaled $4,291.95; tab D/exhibit 14 totaled $142,972.40; tab F/exhibit 15 totaled $4,791.72; and tab G/exhibit 16 totaled $4,197.47. These four tabs/exhibits total $156,253.54. At trial, Ladera also introduced exhibit 64, which Martin testified includes "invoices that are also part of the backup of the summary of events" and "supplement[s] Exhibit 10 with an additional amount" totaling $19,441.33. However, upon review, the invoices in exhibit 64 are duplicates of invoices in tab D/exhibit 14 and tab F/exhibit 15 and therefore are not legally sufficient evidence of additional amounts of repair costs.

[14] Two invoices addressed the concrete culvert, as Martin noted: "One is going to be a mobilization invoice. We had to pay 50 percent of the estimate up front and then the remaining final 50 percent once it was completed." These invoices were included in plaintiff's exhibit 14/tab D and summarized as: D-11 $16,968.00 ("North Drainage Wall – Mobilization to allow overflow water from GC to exit to drainage easement"), D-14 $17,832.00 ("North Drainage Wall – Completion Invoice"). The French drains invoice was also included and summarized as: D-16 $1,225.00 ("Improve drainage from sides of building 11 to drain and daylight towards drainage easement.").

of right next to retaining wall to also allow more water to go out to the easement." Ladera argues that "[t]he 'concrete culvert' and French drains' were installed in an attempt to protect Ladera's property against flooding." But "cost of repairs," as explained by the jury charge, does not include costs for improvements to protect the Ladera Property against future events. We therefore conclude that the evidence of the $36,025 in costs for a concrete culvert and the French drains is legally insufficient evidence of repair costs, as described by the charge.

Second, Golden Corral argues that "there was no evidence of the reasonableness of the repair costs." To demonstrate reasonableness, "the plaintiff must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefore'"; rather, "some other 'evidence showing that the charges are reasonable' is required." *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam) (quoting *Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). To support Ladera's repair costs, Ladera submitted exhibit 10, which includes a summary that lists the corresponding tabbed pages for the attached invoices, the invoices' date, the vendor or employee or temp agency, the summary of the service or work provided, and the cost. The trial court admitted into evidence exhibit 10 and the accompanying tabs as additional exhibits. Martin described exhibit 10 as a document she prepared to enable her "to be in a position to have those weekly meetings with [Ladera] about the events going on, the income, the expenditures and so forth for Ladera" and "to organize all of the events and expenses that were taking place during this time and to relay it to the owner." Martin further explained each relevant tab as including:

- Tab B: "[T]here's a significant amount of electricity that is used in there with the blowers, dehumidifiers, that is also on here, per month, of all of the electricity costs that we incurred, and had to pay to the City of Austin while they were down"; "[t]hese are for the times the units were down and that Ladera took over the electricity expense"; and

25

"[w]e don't have a choice for electricity at the location of Ladera. We only have one utility provider that we're able to use, and that is the City of Austin[.]"

- Tab D: "[C]ontract work and services . . . and the date is by invoice date and also explained brief summary of what it was; the contractor or vendor that did it and then the costs associated with it," including "[a]ny of the contract work that we did to try to get water off of the property."

- Tab F: "[E]ssentially anything that the property purchased to assist us in these matters, so anywhere from an extra blower, dehumidifier if we had to replace any of the appliances in the units, if there is anything that was an expense that wasn't contracted out, but was an expense on the property."

- Tab G: "[P]ayroll and overtime pay . . . a lot of overtime that was accounted for that we went ahead and put on here so we could see and really explain the variance as to our budgeted payroll that we had versus the actual payroll that was coming in because of the overtime hours spent by our team."

Martin testified that "all of the dollar numbers reflected on this chart reflect money which has actually been expended, not just out there to be paid or something"; that it was updated "any time there is an expense that is going to come through"; and that the information would be "available for [her] weekly communications with the owner." However, Martin did not directly testify as to the reasonableness of those costs.

On appeal, Ladera points to Greystar's contractual obligations to Ladera as support for the reasonableness of the costs. The 2014 apartment management agreement was admitted into evidence and provides that Greystar "shall incur such expenses as may be necessary to operate and maintain the [Ladera Property] in a reasonable manner"; shall "[p]erform other services reasonably necessary for the care, protection, maintenance and operation of the [Ladera Property] and the prevention of waste, damage, or injury thereto"; and "in the case of an emergency, [Greystar] may spend such sums as [Greystar] may deem reasonably necessary to protect persons from injury and minimize further damage to the [Ladera

26

Property], to prevent default by [Ladera] under contracts which have been delivered to [Greystar] and to avoid suspension of services in or to the [Ladera Property]." Martin also testified that Greystar was obligated under the agreement to make repairs; to review bills and statements received for services, work, or supplies; and to provide a monthly report to the owner of expenditures. Therrien testified that he read Greystar's monthly reports that are about "150/160 pages." Thus, Ladera argues, "Greystar had an obligation to have all repairs performed at reasonable costs, as well as an owner closely monitoring what Greystar was doing."

Although we agree with Golden Corral that "Ladera resorts to *indirect* evidence that it claims is sufficient to uphold the award," we conclude that the circumstantial evidence of Greystar's contractual obligations—when considered with Martin's and Therrien's trial testimony and Martin's documentation and invoices providing for electricity costs paid, contract work and services provided, equipment rented or purchased, and payroll and overtime pay to restore the Ladera Property that were admitted into evidence—constituted more than a scintilla of evidence that the documented costs for repairs were reasonable. Nevertheless, when the $36,025 in costs for the concrete culvert and French drains is subtracted from the documented $156,253.54 in total repair costs, the remaining amount of $120,228.54 is legally insufficient to support the $160,000 award. Thus, "although the evidence is legally sufficient to support a finding of some amount, it is legally insufficient to support the entire amount the jury found." *Akin*, 299 S.W.3d at 123. "[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment," *id.* at 124, and "we may either suggest a remittitur or remand to the trial court for a new trial," *DeNucci v. Matthews*, 463 S.W.3d 200, 215 (Tex. App.—Austin 2015, no pet.); *see Romano v. Newton*, No. 03-06-00255-CV, 2007 WL 2509838, at *7 (Tex. App.—Austin Sept. 6, 2007) (mem. op.) ("An appellate court

27

may suggest a remittitur on its own motion when an appellant complains that there is insufficient evidence to support an award and the appellate court agrees, but there is sufficient evidence to support a lesser award."), *supplemented*, 2007 WL 4269864 (Tex. App.—Austin Dec. 7, 2007, no pet.) (mem. op.) (reversing and remanding case because no remittitur was filed within deadline). Accordingly, we suggest a remittitur of $120,228.54. *See* Tex. R. App. P. 46.3 (providing that "court of appeals may suggest a remittitur"). We reform this portion of the district court's judgment and, as reformed, affirm conditioned on Ladera filing this remittitur within 30 days of the date of this opinion.[15] *See Bennett v. Grant*, No. 03-11-00669-CV, 2018 WL 4039560, at *3 (Tex. App.—Austin Aug. 24, 2018) (mem. op.) (providing 30 days to file remittitur), *supplemented*, 2018 WL 4868713 (Tex. App.—Austin Oct. 9, 2018, no pet.) (mem. op.).

## CONCLUSION

For these reasons, we reverse and render a take nothing judgment on damages for diminished value of property; we reform the trial court's judgment as to the damages award for repair costs; and, as reformed, we affirm the judgment (other than the diminished value damages award) conditioned on Ladera filing the remittitur within 30 days of the date of this opinion.

---

[15] Otherwise, we will reverse this portion of the district court's judgment and remand the cause to the district court for a new trial on the unliquidated damages for the costs of repair. *See* Tex. R. App. P. 46.3 ("If the remittitur is not timely filed, the court must reverse the trial court's judgment."). Because an appellate court "may not order a separate trial solely on unliquidated damages if liability is contested," *id.* R. 44.1(b), and because Golden Corral has contested liability, remand of the issues of liability and the unliquidated damages for repair costs and loss of use of property will be necessary, *see Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 740 (Tex. 1997).

28

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Kelly, and Smith

Reversed and Rendered in Part; Reformed and, As Reformed, Affirmed in Part Conditioned On Remittitur

Filed:  July 9, 2021